SLOAN, STEVENS & MORRIS vs. THE STATE.

*March 10 — March 24, 1881.*

CONSTITUTIONAL LAW: STATE DEBT: TRUST FUNDS FOR INTERNAL IMPROVEMENTS. *(1) State cannot contract a debt for an internal improvement. (2) A judgment against the state constitutes a state debt. (3) Duty of secretary of state as to auditing accounts against trust funds.*

1. Under all the provisions of art. VIII of the state constitution, taken together, the state cannot be a party in carrying on any work of internal improvement, unless a grant of land or other property has been made to it, specially dedicated by the grant to such work; if such grant and dedication have been made, the state may carry on the particular work, and must devote thereto the avails of the grant, and may anticipate the revenues derived from the work and pledge them in aid of its completion; but the legislature cannot contract a state debt on account of such work, in any event or under any circumstances whatsoever.

2. Plaintiffs were employed by the governor of this state to render legal services in defending replevin suits against the agents of the state, who had, in pursuance of ch. 46, Laws of 1869, seized logs cut by trespassers upon lands granted to the state to aid in the construction of railroads; and the secretary of state having refused to audit, and the legislature having refused to appropriate money to pay, their account against the state for the amount which they allege that their services were worth, this action was brought to recover that amount. *Held*, that a judgment in their favor, as demanded, would constitute a debt against the state on account of a work of internal improvement; and the complaint must therefore be dismissed.

3. The special statutes (of 1869 and 1871), under which plaintiffs were employed, provide all necessary processes to enable them to obtain payment for their services out of the specific fund which alone can be charged therewith; and their proper remedy (if there is money of that fund in the treasury) is a renewed application to the secretary of state to audit and allow their claim as against such fund, and a proceeding by *mandamus* in case of his refusal.

COLE, C. J., and TAYLOR, J., concur in the first but dissent from the other two propositions, holding, (1) That the secretary of state has no authority to determine the amount to which plaintiffs are justly entitled for their services, and therefore (such amount not being otherwise liquidated) cannot audit and allow their claim. (2) That, as it appears that there is in the state treasury a large amount of the special trust fund to which plaintiffs' services are properly chargeable, a judgment rendered in their favor in this action would be chargeable upon said fund, and would not constitute a state debt within the meaning of the constitutional prohibition.

The plaintiffs, who constitute the law firm of *Sloan, Stevens & Morris*, brought their action in this court to recover compensation, *quantum meruit*, for legal services rendered by members of the firm to the state. The case came before the court on a motion of the plaintiffs for judgment on the complaint and answer, and on a motion of the attorney general to dismiss the complaint. These motions were submitted *ore tenus*, at the sitting of the court on the 10th of March, 1881, and were argued together. The complaint alleges that under and by virtue of chapter 46, Laws of 1869, entitled "an act to protect the lands and timber thereon granted to the St. Croix & Lake Superior Railroad Company," General Samuel Harriman, who

had theretofore been appointed by the governor an agent of the state, by virtue of said act, for the purposes therein mentioned, seized a large quantity of logs which had been cut by different persons upon lands granted to the state by congress to aid in the construction of railroads. The claimants of these logs brought actions of replevin in a court of the state of Minnesota against the agent, to recover the same, and such proceedings were had therein that the logs were delivered to such claimants. The replevin suits were removed to the circuit court of the United States for the district of Minnesota. By arrangement between the parties, two of these suits were selected as test cases and tried in the latter court. The principal contention of the plaintiffs in those suits was, that the lands granted to the state for railroad purposes, upon which the logs in controversy were cut, had reverted to the United States by reason of the failure of the state to comply with the terms and conditions of the grants. The trials resulted in judgments for the agent, amounting to $22,000. The amount involved in all of the suits was about $70,000. The value of the lands granted, the title of the state to which was thus assailed, was several millions of dollars. It was stipulated by the parties that the other suits should abide the event of those which were tried.

The plaintiffs in the two suits thus tried sued out writs of error and removed the judgments to the supreme court of the United States for review. Because of the interest which the general government was supposed to have in the protection and preservation of the lands granted by it to the state, it was expected that the attorney general of the United States would argue the causes on behalf of the defendant therein, who represented the state. But that officer had given an official opinion to the secretary of the interior to the effect that those lands had already reverted to the United States because the conditions of the grants remained unperformed, and that the state of Wisconsin had ceased to have any interest in them. Of course

this opinion disqualified him to argue the side of the state in the federal court. Thereupon the governor employed the plaintiff *Stevens* to prepare a brief in the cases in the interest of the state, and subsequently employed the plaintiff *Sloan* to argue the cases. Those gentlemen performed the services which they were respectively employed to perform. The results of the litigation were, that the judgments of the circuit court of Minnesota were affirmed, and the claim that the lands had reverted to the United States was defeated. After the litigation was ended, the plaintiffs, Messrs. *Sloan, Stevens & Morris*, presented their account for services to the secretary of state to be audited. The secretary declined to audit the account and draw his warrant on the treasurer for the amount allowed, on the ground that he had no authority to do so. They then presented the claim to the legislature, but that body refused to make an appropriation to pay it. They now bring suit therefor against the state. It is further alleged in the complaint that there remains in the treasury of the state over $100,000, collected on account of trespasses upon the lands thus granted to the state.[1]

---

[1] The constitution of this state (art. VI, sec. 2) declares that the secretary of state "shall be *ex officio* auditor." Ch. 10, R. S. 1858, contained the following provision: "Section 27. It shall be the duty of the secretary of state as auditor . . . . 9. To examine and determine the claims of all persons against the state in cases where provision for the payment thereof shall have been made by law, and to indorse upon the same a certificate of the amount due and allowed thereon, and from what fund the same is to be paid. He shall certify the same to the state treasurer, specifying the name of the person in whose favor such account shall be audited, the amount allowed, and from what fund the same is payable; and he shall report to the legislature, annually, a complete list of all accounts so audited and certified: *provided*, that no account shall be so audited except the same be duly verified by the oath, affidavit or affirmation of the claimant or his agent, together with the certificate of the officer ordering or making the claim."

Said ch. 10, R. S. 1858, contained also the following among other provisions relating to the duties of the governor: "Section 2. Whenever he [the governor] shall receive notice of the commencement of any action or proceeding between other parties, by which the rights, interests or other property of

Sloan, Stevens & Morris vs. The State.

*I. C. Sloan,* for the plaintiffs.

*H. W. Chynoweth,* Assistant Attorney General, for the defendant.

LYON, J.   The lands donated to the state by congress to aid in the construction of certain railroads, when accepted by the state, were held by it in trust for the uses and purposes speci-

the state, shall be liable to be injuriously affected, he shall inform the attorney general thereof, and require him to make every legal and equitable defense against such action or proceeding; and in any such case, or in any action prosecuted or defended in behalf of this state, he may, if the public interests require it, employ such counsel as he shall deem proper, to assist the attorney general in any such action or proceeding; and in case of the absence or sick- ness of the attorney general, or if he shall be any way interested adversely to the state in any action or proceeding, the governor may employ counsel to act in his stead."

By sec. 4 of the same chapter, it was provided that " all expenses incurred " under sec. 2, should be "paid out of the state treasury."

Chapter 46, General Laws of 1869, provided for the appointment, by the governor, of agents to protect timber on lands granted by congress to this state for the construction of railroads (sec. 1); made it the duty of such agents to take possession in the name of the state of all logs and timber unlawfully cut upon or carried away from said lands, sell the same at public auction, and pay the net proceeds into the state treasury (sec. 2), and also to prosecute per- sons trespassing upon such lands (secs. 3 and 4); and then further provided as follows: "Section 5. Each of said agents, appointed by virtue of this act, shall make a full and complete verified report on the last days of March, June, September and December in each year, of all actions commenced and moneys collected, paid out or expended in carrying out the provisions of this chapter, and shall receive such compensation as shall be fixed by the governor, and his necessary expenses: *provided*, that the costs and expenses aforesaid shall not be paid until vouchers and bills for the same shall have been filed with the secretary of state, and approved and allowed by him; and all the compensa- tion and expenses herein mentioned shall first be audited and approved by the secretary of state, and shall be paid by the state treasurer; and a sum suffi- cient to pay the same, to be audited as aforesaid, is hereby annually appropri- ated out of any money in the state treasury received from collections made by said agent or agents in pursuance of this act."

Chap. 75, General Laws of 1871, amended the fifth section of the act of 1869 so as to read as follows: "Section 5. Each of said agents, appointed by virtue of this act, shall make a full and complete verified report on the last

fied in the several acts of congress donating the same. Within the limits hereinafter stated, it was the clear duty of the state, thus acting as a trustee, not only to apply the lands and the proceeds thereof to the purposes of the trust, but also to protect the lands from spoliation while the title thereto remained in the state, and to compel persons who had unlawfully taken timber therefrom to re-imburse the trust fund to the extent of the damages they had committed upon the lands. In the execu-

days of March, June, September and December in each year, of all actions commenced and moneys collected, paid out or expended in carrying out the provisions of this chapter, and shall receive such compensation as shall be fixed by the governor, and his necessary expenses: *provided*, that the costs and expenses aforesaid shall not be paid until vouchers and bills for the same shall have been filed with the secretary of state, and approved and allowed by him; and all the compensation and expenses herein mentioned, and all expenses heretofore or hereafter incurred by any state officer, under direction from the governor, in relation to the protection of said lands, or securing such protection, shall first be audited and approved by the secretary of state, and shall be paid by the state treasurer; and a sum sufficient to pay the same, to be audited as aforesaid, is hereby annually appropriated out of any money in the state treasury received from collections made by said agent or agents in pursuance of this act; and where said expenses have heretofore been paid from any fund belonging to the state, the amount thereof, as audited and allowed, may be paid out of such collections to such fund."

Sec. 131, R. S. 1878, is as follows: "Section 131. Whenever, in the opinion of the governor, the rights, interests or property of the state shall have been or shall be liable to be injuriously affected, he may require the attorney general to institute and prosecute any proper action or suit for the redress or prevention thereof; and whenever he shall receive notice of any action or proceeding between other parties, by which the rights, interests or property of the state shall be liable to be injuriously affected, he shall inform the attorney general thereof, and require him to make every legal and equitable defense against such action or proceeding; and in any such case, or in any action prosecuted or defended in behalf of this state, he may, if the public interests require it, and he and the secretary of state and state treasurer shall certify it to be necessary, employ such counsel as he shall deem proper, to assist the attorney general in any such action or proceeding; and in case of the absence or sickness of the attorney general, or if he shall be in any way interested adversely to the state in any action or proceeding, the governor may employ counsel to act in his stead. The compensation for such counsel shall be fixed by the governor, and paid out of the state treasury."

tion of these duties the power of the legislature is plenary, with the single limitation that it cannot authorize expenditures beyond the amount of the trust funds in that behalf under the control of the state. To do so would be to create a state debt not authorized, and therefore prohibited, by the constitution. Const., art. VIII, secs. 4, 10.

The constitution provides that "whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works of internal improvement, the state may carry on such particular works, and shall devote thereto the avails of such grants, and may pledge or appropriate the revenues derived from such works in aid of their completion." But over this grant of power, controlling and inflexibly limiting it, is the prohibition, "*the state shall never contract any debt for works of internal improvement.*" Section 10, *supra.*

Section 6 of art. VIII authorizes the state, under certain conditions and limitations, to contract public debts, not exceeding in the aggregate $100,000, "for the purpose of defraying extraordinary expenditures." But manifestly the expenditures for which such indebtedness may be contracted must be made by the state in the performance of functions pertaining to its sovereignty. The execution of the trust assumed by the state, in respect to the lands granted to it in aid of the construction of railroads, is not one of those functions.

When our constitution was adopted, the subject of state indebtedness, particularly for works of internal improvement, was prominent in the public mind. Some of the states had theretofore contracted large debts in the prosecution of such works, and the weight thereof pressed heavily upon the people. Moreover, the territory of Wisconsin had incurred liabilities, the amount of which was then unascertained, on account of lands theretofore granted by congress to the territory to aid in connecting by a canal the waters of lake Michigan and Rock

river.  These liabilities the future state would necessarily
inherit, and the act of congress for the admission of the state
of Wisconsin into the Union, approved May 29, 1848, provided
expressly that such liabilities should be paid and discharged
by the state.  Taylor's Statutes, 85, § 2.

Beyond those liabilities the framers of the constitution were
solicitous that no such evil should ever afflict this state.
Hence the general prohibition of sec. 4, art. VIII: "The
state shall never contract any public debt, except in the cases
and manner herein provided;" and the specific prohibition of
section 10: "The state shall never contract any debt for works
of internal improvement."  Hence, also, section 3: "The
credit of the state shall never be given or loaned in aid of any
individual association or corporation;" and section 9: "No
scrip, certificate or other evidence of state debt whatsoëver
shall be issued, except for such debts as are authorized by the
sixth and seventh sections of this article."  Reference has
already been made to the sixth section.  The seventh section
authorizes the legislature to borrow money to repel invasion,
suppress insurrection, or defend the state in time of war.
Under this section the bonds of the state, known as "war
bonds," were issued during the late rebellion.

Having thus guarded against the creation of a state debt
exceeding $100,000, except in case of insurrection or war, and
having doubly guarded against the creation of any debt for
works of internal improvement, the framers of the constitu-
tion proceeded to consider another subject vital to the interests
of the future state.  The policy of donating portions of the
public domain in aid of works of internal improvement had
been inaugurated by congress.  As already stated, a grant of
land had been made to the territory to aid in the construction
of a canal from Lake Michigan to Rock river.  Congress had
also made another grant to the future state, upon its admission
into the Union, to aid in the improvement of the Fox and
Wisconsin rivers.  Other grants to the state for kindred pur-

Sloan, Stevens & Morris vs. The State.

poses were confidently expected, and that expectation was afterwards fully realized. The improvements in aid of which these grants were made and expected, were needed to facilitate the settlement and develop the resources of the state, and their early construction by unaided private enterprise could scarcely be hoped for. It seemed, therefore, to be sound policy for the state to leave itself free to accept such grants and to execute the trusts thereof. And so the framers, wisely no doubt, inserted the provision that the state might carry on particular works in aid of which a grant had been made to it.

The provision of the constitution last mentioned contains a very significant clause authorizing the legislature to "pledge or appropriate the revenues derived from such works in aid of their completion." This clause would be surplusage but for the previous prohibition to contract debts on account of the improvements. Its insertion shows how the framers understood the instrument. The same considerations which prompted the convention to frame the constitution as it is, led the people to adopt it as the fundamental law of the state.

Reading the provision under consideration in connection with the other limitations contained in the constitution, and in the light of the conditions which existed when the instrument was framed and adopted, its true intent and meaning are perfectly plain. It prohibits the state from being a party in carrying on any work of internal improvement, unless a grant of land or other property has been made to it, specially dedicated by the grant to such work. If such grant and dedication have been made, the state may carry on the particular work, and it must devote thereto the avails of the grant. It may also anticipate the revenues derived from the work and pledge them in aid of its completion. But the legislature cannot contract a state debt on account of such work, in any event or under any circumstances whatsoever.

That large sums of money have from time to time been appropriated by the legislature and paid out of the general fund

of the state, in violation of this constitutional inhibition, is undeniably true. The case of *State ex rel. Martin v. Doyle*, 38 Wis., 92, discloses such an appropriation and payment. Neither in that case nor in the late case of *Martin v. The State, ante,* p. 407, which was brought to recover the unpaid balance of the award mentioned in the former case, did the court reach the question now under consideration. The claim was held invalid on grounds preliminary to that question. But had the statutes upon which that claim was founded made an absolute and unconditional appropriation to pay the award, most undoubtedly it would have been held that they are in contravention of the constitution, and therefore void. The courts owe and cheerfully yield great deference to acts of the legislature. It is vastly more agreeable to approve than to antagonize the action of a coördinate department of the government. But legislation which breaks down the most vital safeguards of the constitution, and casts upon the people the burden of liabilities which they solemnly and emphatically declared in the organic law should not be cast upon them, cannot be upheld by this court. To sustain such legislation would be a practical abdication of the functions of the court.

It remains to apply the principles herein enunciated to the present case. If this action is sustained and the plaintiffs recover, the judgment will be an indebtedness of the state, and must be paid out of the state treasury like any other judgment, whether any of the trespass fund remain in the treasury or not. R. S., 827, sec. 3203.[1] Because this is so, it necessarily follows, from the views above expressed, that the action cannot be maintained. Hence, without looking into the answer inter-

[1] The section here cited is as follows: " Sec. 3203. No execution shall issue against the state on any judgment, but whenever a final judgment against the state shall have been obtained in any such action, the clerk shall make and furnish to the secretary of state a duly certified transcript of such judgment; and the secretary of state shall thereupon audit the amount of damages and costs therein awarded, and the same shall be paid out of the state treasury."

posed in behalf of the state, the motion of the attorney general to dismiss the complaint must be granted.

But it does not necessarily follow that the plaintiffs are without remedy. We have already said that it was the clear duty of the state to protect and preserve the lands so held in trust by it, and to prosecute trespassers thereon, so far as it could do so without incurring any general indebtedness on account thereof. To this end, any money in the treasury derived from such lands may lawfully be appropriated to pay the necessary expenses. Chapter 46 of 1869, which provides for the appointment of agents for the purposes above mentioned, and for payment of the compensation and expenses of such agents out of the trespass fund in the treasury, is in strict accord with the principles above enunciated. That act only provided, however, for the payment of expenses incurred by the agents. A more extensive provision was deemed desirable, and so, by the enactment of chapter 75 of 1871, the legislature amended the act of 1869 by making an appropriation of money out of the trespass fund sufficient to pay the expenses which might be incurred in that behalf by any state officer under the direction of the governor, as well as by the agents. This amendment, although somewhat inartificially drawn, plainly authorizes the governor to bind the fund by expenditures on account of the lands thus held in trust by the state; and under it he may incur the expense directly, or he may authorize some other state officer to do so.

The plaintiffs were employed by the governor directly, as counsel in the actions pending in the supreme court of the United States, to defend the rights of the state as trustees to the lands from which the logs in controversy had been taken. Compensation for their services is as much an expense, within the amended act, as are the wages of the men employed by an agent to remove logs seized by him by virtue of the act, and is equally included in the appropriation clause.

The above acts provide that such expenses shall be audited

and approved by the secretary of state, and paid by the treasurer, and appropriates a sum sufficient to pay the same out of the fund collected and paid in by agents under the acts. This fund has been mentioned as the trespass fund.

It is not necessary to discuss here the nature and extent of the general power of the secretary of state as auditor, or to determine whether he can fix the amount of compensation to be paid counsel employed by the governor under R. S. 1858, ch. 10, sec. 2, in cases where the compensation has not been agreed upon between the governor and such counsel. Under the present revision such compensation must be fixed by the governor. R. S., 92, sec. 131. This seems to remove all difficulty.

The plaintiffs were not employed by virtue of the general statute, but under the special statutes of 1869 and 1871. These provide all the necessary processes to enable them to obtain payment for their services out of the specific fund which alone can be charged therewith. Such services were rendered in 1874. In 1875 they filed their account therefor with the secretary of state for allowance and payment. That officer took a mistaken view of the law, and declined to pass upon the account. If any of the trespass fund still remains in the treasury, the plaintiffs may again apply to the secretary to audit and allow the account already filed, and the legality of any action by him thereon, adverse to the plaintiffs, may be reviewed by any competent court in proceedings by *mandamus* to compel the secretary to audit and allow the claim.

Cole, C. J. I am not able to concur in the judgment in this case, and, considering the importance of the questions involved, I deem it proper to state briefly the grounds of my dissent. I fully agree with the court in the proposition that the state cannot contract a debt for works of internal improvement, or be a party in carrying on such works; that it can only accept as a trustee grants of land made by the general government to

aid in the construction of particular works, and apply the proceeds of such lands to the purposes of the grant.   In accepting the grant of land to aid in the construction of a railroad from the river St. Croix to the west end of Lake Superior, it became the plain duty of the state, while it held the title, to protect these lands against trespassers, and to prosecute any person who might cut and carry away timber growing upon them.   Chapter 46, Laws of 1869, and chapter 75, Laws of 1871, were necessary and proper enactments to secure that end.   Under these acts the governor was expressly authorized to employ agents to look after these lands and fix their compensation. The governor was likewise authorized to employ attorneys, if necessary, to prosecute and defend suits arising under these laws.   The governor probably had the power, under the general statute (Tay. Stats.,ch. 10, § 2, p. 260) to employ counsel to prosecute or defend actions in behalf of the state which affected or concerned these lands, if the rights or interests of the state as trustee required it.   It appears from the complaint that the governor employed the plaintiffs to aid in defending the replevin suits therein mentioned; and that the plaintiffs have rendered legal services for the state in this employment, and have never been paid therefor.   It appears that the state thus far has refused to pay them.   I see no reason why they should not be paid what their services were reasonably worth.

It is alleged that there is now in the treasury of the state $100,000, received for collections made by agents for acts of trespass upon these lands.   It seems to me it is the duty of the state to pay the expenses which have been legitimately incurred, including the plaintiffs' services, out of this fund.   It is said that any judgment which this court may render in favor of the plaintiffs must be paid out of the general fund in the treasury, and thus the state will become liable for a debt in carrying on a work of internal improvement.   But the state is in no danger of incurring any such liability, because it has an ample trust fund out of which it may indemnify itself on

paying the judgment. It will doubtless charge the amount paid on the judgment to that fund. So, upon the facts stated, the possibility of incurring an indebtedness in this matter need not be feared. I am not disposed to consider what would be the consequence if there were no trust funds in the treasury of the state to meet this claim. But I do not think the secretary of state, as auditor, has any authority under the law to settle and adjust this unliquidated claim for legal services, nor do I think it competent for the legislature to confer upon him that power. He has no authority to call witnesses, take testimony, and investigate facts as to the value of these services. That is the province of the courts. The word "auditor," as used in the constitution, does not, *ex vi termini*, import one clothed with judicial power or function. It fairly implies that the officer is one who mainly exercises or performs a ministerial duty. These points were so decided by this court in the case of *The State ex rel. Dixon v. Doyle*, at the January Term, 1876. I drew up the opinion of the court in that case, but the relator discontinued the action before the decision was announced. But I had not then, nor have I now, any doubt as to the correctness of these conclusions, which I understood to be concurred in by the other members of the court. Under these circumstances, I do not agree with the court that the secretary of state can audit this claim. I think both motions, in view of the matters stated in the answer, should be denied.

TAYLOR, J. I concur with the views of the chief justice.

*By the Court.*— Let judgment be entered dismissing the complaint.