[No. 12856.   In Bank. — December 12, 1888.]

## CITY OF SAN DIEGO, APPELLANT, *v.* J. W. GRANNISS, RESPONDENT.

SAN DIEGO — CITY LIMITS — TAXATION. — The peninsula of San Diego is within the limits of the city of San Diego, and land situated on said peninsula is subject to assessment and taxation for city purposes, though not included within the limits of lands patented to the city of San Diego.

MUNICIPAL CORPORATION — JURISDICTION — TAXATION. — A grant of municipal jurisdiction over certain limits includes all the powers which the municipal corporation is given by its charter, including the power of taxation.

ID. — ELECTIVE FRANCHISE. — It cannot be assumed that the legislature intended to give the right to vote at city elections to people who are non-residents of the city, and who are not subject to its taxation.

STATUTE — PRINCIPLES OF CONSTRUCTION. — All parts of a statute are to be considered together, keeping in view the subject-matter of legislation, in order to ascertain the legislative intent. Effect should be given to such clause when it can be done; but one clause may be enlarged or limited by other provisions upon the same subject. No construction of words is admissible which gives to them an absurb signification, if any other reasonable construction is possible.

APPEAL from a judgment of the Superior Court of San Diego County.

The facts are stated in the opinion of the court.

*Harry L. Titus*, for Appellant.

He who takes the benefit must bear the burden. (Pol. Code, sec. 352.) There should be no representation without taxation. As an election cannot be held without expense, those who have a right to vote must be subject to taxation to meet the expense. (Dillon on Municipal Corporations, sec. 741.)

*Levi Chase*, for Respondent.

Municipal jurisdiction evidently means police jurisdiction. The peninsula is within the city only for voting purposes.

*Hunsaker, Britt & Lamme*, also for Respondent, on petition for rehearing.

The court is mistaken as to the topography of San Diego, being misled by an imperfect map. The wards into which the city is divided do not extend across the bay to the peninsula. The definition of the wards must control uncertainty from definitions of the city limits. (*Green* v. *Cheek*, 5 Ind. 105.) The specification that "for voting purposes" the inhabitants of part of the peninsula shall be considered as in the second ward should be held to exclude all other purposes. (*Perkins* v. *Thornburgh*, 10 Cal. 189; *Miller* v. *Miller*, 44 Pa. St. 171, 172.) Residence in a city is not necessary, except by positive enactment, even to holding municipal office. (*State* v. *Swearinger*, 12 Ga. 23; *State* v. *Blanchard*, 5 La. Ann. 515.) Lands within city limits may be exempted from city taxation. (*Lee* v. *Thomas*, 49 Mo. 114.) Territorial boundaries of a city, and the limits of municipal jurisdiction, are not necessarily coincident. (*Coldwater* v. *Tucker*, 36 Mich. 479; 24 Am. Rep. 601; *Chicago Packing Co.* v. *Chicago*, 88 Ill. 221.)

McFarland, J.—This case was submitted to the court below upon an agreed statement under sections 1138 et seq. of the Code of Civil Procedure.   Judgment was rendered for the defendant, and plaintiff appeals.   The matter involved is the right of plaintiff to assess and tax certain land of defendant, situated on what is known as the peninsula of San Diego, the question being whether or not said land is within the limits of the city.   And its determination depends upon the true construction of an act of the legislature approved April 1, 1876, entitled "An act to reincorporate the city of San Diego."   (Stats. 1875–76, p. 806.)

From the maps before the court, and admitted to be substantially correct, it appears that the main body of the city is built around three sides of the bay of San Diego, somewhat in the shape of a horseshoe.   The upper or inland end of the bay is toward the north, and the lower end, or mouth, is toward the south.   Leaving the mainland at a point on the east side of the bay, and apparently not far from its mouth, is a strip of land which runs northerly up through the bay, and is called the "peninsula."   The body of water lying immediately around the peninsula (on three sides) is called "ship's channel," and on the westerly side leads out to the open sea.   The peninsula runs far beyond the middle of the bay, its exact distance from the northern shore not appearing, and it is in the very center of the horseshoe. It is, topographically, almost as much in the heart of the city as if the latter inclosed it on all sides, as in a circle.   There is a line designated in the said act incorporating the city as "a line drawn from the southwest corner of the pueblo at Chollas Valley, due west to the light-house at Point Loma"; and it is admitted that if the southerly limits of the city extend to that line (which is substantially a line between the two ends of the "horseshoe"), then the plaintiff should have had judgment. And the same admission is made if the city limits ex-

tend over the bay "and into the ocean to the extent of one marine league from the shore." But San Diego was a pueblo, and received a patent as such from the United States in accordance with a certain survey made in 1858 by J. C. Hayes. This patent does not include any part of the peninsula, but is confined to lands outside of the shores of the bay. And defendant contends that the limits of the city are bounded by the lines of the patent, except only that the water-front along the ship's channel is slightly modified. We have thus stated the situation sufficiently for an understanding of the subject with which the legislature was dealing.

Defendant's contention, it seems to us, rests almost solely upon the proposition of considering the first clause of the first section of the act in question alone, and ignoring all other parts of the act which bear upon the question of the city's limits,—a proposition which cannot be maintained without violating well-settled rules of construction. One clause of a statute or contract, apparently conclusive as to some particular thing, may be enlarged or limited by other provisions of the instrument upon the same subject. And in such a case the intent must be gathered from all the provisions considered together, the interpreter having his eye on the subject-matter of the instrument, and giving effect to each clause of the latter, when it can be done.

The first section of said act is as follows:—

" Sec. 1. All that tract of land known as the pueblo of San Diego, included in the survey made for the city authorities in July, 1858, by J. C. Hayes, United States deputy surveyor-general for the state of California, shall henceforth be known as the city of San Diego, the boundaries of which shall be fixed by the field-notes of the said survey, except the water-front line on the bay, and this shall be ship's channel of the said bay; and the municipal jurisdiction shall extend to said limits, and over

the waters of said bay, and into the ocean to the extent of one marine league from the shore."

It will be observed that if this section 1 were to be alone considered, the construction contended for by defendant would not, by any means, be assured. It provides that the field-notes of the Hayes survey (the pueblo patent) shall furnish the boundaries of the city about to be incorporated, *except as to the water-front line.* The front line is, therefore, *not* to be fixed by the lines of the patent. How then is it to be fixed? The section first speaks of the line "ship's channel." But a glance at the map shows that ship's channel is a very indefinite thing.

It is a body of water of indefinite width in the form of the letter U, commencing near the place where the peninsula leaves the mainland, and running up the easterly side, through the deep and wide northern part of the bay, around the head of the peninsula, and down the westerly side into the ocean. Now, is the intent that the front of the city shall be a curved line supposed to be drawn through the deep water along the outer undefined edge of this indefinite channel? Or is the intent that it shall include, at least, all that lies north of a line drawn through and connecting the southerly parts of this siphon-shaped figure? The former construction would be inconsistent with the clause of the section which immediately follows, and which provides that the municipal jurisdiction shall extend "to said limits," *and* into the ocean to the extent of one marine league from the shore. There is no limitation attached to the words "municipal jurisdiction," and they include, of course, all the powers which the municipal corporation is given by its charter. And the charter includes all the powers usually granted such corporations, the power of taxation being expressly mentioned. There is no ground for the position that the word "jurisdiction," as here used, should be construed as meaning jurisdiction for certain

special purposes only. It is subject to no limitations other than those of the charter itself.

But there are other provisions of the act which throw strong light upon the question under discussion. Section 2, which divides the city into wards, provides as follows: "For voting purposes, the inhabitants of that portion of *the peninsula* of San Diego which lies north of a line drawn from the southwest corner of the pueblo at Chollas Valley, due west to the light-house on Point Loma, shall be considered as in the second ward, and said inhabitants shall have the right to vote at city elections." (The land north of that line includes practically the whole of the peninsula.) And the only way to get rid of this provision and maintain the contention of defendant is to assume that the legislature intended to give the elective franchise to people who were not residents of the city, and lived beyond its limits, free of any burden of taxation. But such an assumption would be in the very teeth of the time-honored rule that no construction of words is admissible which gives to them an absurd signification, if any other reasonable construction is possible. And that this clause was put into the act upon the understanding by the legislature that it was making the peninsula a part of the territory of the city, is apparent from subsequent provisions. Section 4 provides that no person shall be eligible to any city office, "nor shall any person be entitled to *vote* for the same, who shall not be a qualified voter according to the constitution of the state, and who shall not have *resided in the city and ward* for which he shall be elected, *or offer to vote*, for thirty days next preceding the election." And section 5 provides that officers "shall be elected by the qualified voters of the city, *as aforesaid.*"

But section 27 makes it quite clear, we think, that the legislature intended to put into the area over which the new city government was to have municipal jurisdiction more "land" than was included in the patent for the

pueblo, as described in the first clause of section 1. It is as follows:—

"Sec. 27. This charter or act shall not be construed as to give the city authorities, or the citizens of San Diego, any control or title to *the land lying outside* of the city, or pueblo, boundary line as confirmed by the patent to the city of San Diego, *except for municipal purposes only;* nor shall any park, cemeteries, or other property set aside for public purposes be sold by the city authorities without an act of the legislature of this state being first obtained therefor."

So there *was land*—not water merely, as contended by defendant—lying outside of the lines of the patent over which the city was to exercise control for municipal purposes. But as the city owned, as a *proprietor*, certain pueblo lands within the lines of the patent (and this appears in the act itself), it was thought prudent to provide that the act should not be so construed as to give the city any *title*, as a proprietor, to any of the land outside of those lines. But how could there be any such outside land under a construction which shuts its eyes to everything but the first part of the first section of the act.

Our conclusion, arrived at by reading and considering all the provisions of the act together and keeping in view the subject-matter of the proposed legislation, is, that the legislative intent was to erect a city government which should embrace all the land included in the lines of the pueblo patent, and also all the territory, whether covered by water or not, which lies within the sharply curved line around which the city is mainly built. To accomplish this purpose, it is provided, first, that the boundaries of the new corporation shall be fixed by the field-notes of the survey, which were followed in the patent, except the lines on the water-front. This fixes the back and side lines on the mainland. As to the front, or water lines, it is then provided that the jurisdiction shall

extend over the bay and into the ocean to the extent of one marine league from the shore. The peninsula is, then, *expressly mentioned* as part of the city; and it is provided that its inhabitants shall vote in the second ward. And then, assuming that there is to be land within the limits of the proposed city, outside of the pueblo boundaries, and knowing that the city will have a proprietary interest in certain lands *within* the pueblo, the legislature provided that, as to the outside lands, the act shall not be so construed as to give the city any *title* to them, but that it shall have over them the control and jurisdiction usually exercised by municipal corporations for municipal purposes.

Our opinion therefore is, that the said peninsula is within the corporate limits of San Diego.

The judgment of the superior court is reversed, with directions to enter judgment for plaintiff for the amount mentioned in the agreed statement of facts.

SEARLS, C. J., SHARPSTEIN, J., PATERSON, J., and THORNTON, J., concurred.

Rehearing denied.