THE STATE OF KANSAS, *ex rel. C. C. Coleman, as Attorney-general,* v. T. T. KELLY, *as Treasurer, etc., et al.*

No. 14,438.   (81 Pac. 450.)

SYLLABUS BY THE COURT.

1. STATUTORY CONSTRUCTION—*Methods of Interpretation.* In the interpretation of an ambiguous statute courts should examine it in the light of the history of its enactment as disclosed by the journals of the legislature, the contemporary history of the conditions and situation of the people, the economic and sociologic policy of the state, its constitution and laws, and all other matters of common knowledge within the limits of their jurisdiction.

2. STATE OIL-REFINERY—*"Work of Internal Improvement."* The construction, operation and maintenance of an oil-refinery for the purpose of receiving, manufacturing, storing and handling crude and refined oil and its by-products, and marketing the same, constitute a "work of internal improvement."

3. ——— *Act of 1905 Void.* Senate bill No. 30 (Laws 1905, ch. 478) is an act appropriating money for "works of internal improvement." It contravenes section 8 of article 11 of the constitution, and hence is void.

Original proceeding in mandamus. Opinion filed July 7, 1905. Peremptory writ denied.

STATEMENT.

THIS proceeding was instituted in this court by the state, on the relation of the attorney-general, for a peremptory writ of mandamus to compel Thomas T. Kelly, as state treasurer, and E. B. Jewett, as warden of the state penitentiary, to execute, negotiate and sell certain bonds on behalf of the state of Kansas and apply the proceeds as directed by senate bill No. 30 (Laws 1905, ch. 478). An alternative writ was allowed, to which the defendants separately answered that the state was proceeding under an act authorizing them, in their official capacities, to issue and sell the bonds in question and apply the proceeds thereof to the construction, maintenance and operation of a state oil-refinery at Peru, all of which would be one of those "works of internal improvement" to the carrying on of which the state may never be a party without violating the provisions of section 8 of article 11 of the constitution.

In reply to the claim of defendants the state contends that the intention of the legislature was to build a branch penitentiary in that part of the state where oil is found in large quantities, and, incidental thereto and as a part thereof, for the purpose of furnishing proper employment for the inmates of the state penitentiary, to build and operate an oil-refinery. Anticipating the position that would be assumed by the state, the defendants separately pleaded certain extraneous facts for the purpose of laying the foundation for the introduction of evidence tending to prove that the state had a penitentiary of sufficient capacity for all convicts of the state, complete in all its details, with ample and suitable means for their employment; that the operation of the oil-refinery contemplated would not furnish employment for more than fifteen persons; that the employees in an oil-refinery should be persons skilled in the business of refining oil, and that none of the convicts in the state penitentiary is

thus skilled or has had any such experience. The state moves that these extraneous allegations be stricken from the proceedings. The parties have agreed to certain facts and have filed the depositions of certain witnesses. All questions that the court deems competent and material to the determination of any of the issues involved are considered in the opinion.

*C. C. Coleman*, attorney-general, *S. M. Porter*, and *W. S. Fitzpatrick*, for The State.

*Mulvane & Gault, J. W. Gleed*, and *John L. Hunt*, for defendants; *Gleed, Ware & Gleed*, and *D. E. Palmer*, of counsel.

The opinion of the court was delivered by

GREENE, J.: The sole question in this proceeding is the constitutionality of the act of 1905 called the "oil-refinery bill." In its consideration the object of the statute—that is, the good that the legislature intended to accomplish, or the evil that it intended to prevent or correct—must be determined. Whether this law is simply a provision for securing larger and better facilities for the maintenance, employment and care of the inmates of the penitentiary, thus accomplishing a good work, or a provision for constructing, operating and maintaining an oil-refinery, thus attempting to correct a great evil, is of supreme importance.

In construing a statute resort should first be had to the language of its provisions. If it be found that a clear and definite meaning may be ascertained by giving the words their common signification, the court has no choice or discretion to exercise; its only duty is to declare the result of its investigation. An observance of this rule requires the court to consider every part of the act, and, if possible, to discover from the whole the legislative intent. Another requisite rule of construction is that where it is doubtful which of two objects the legislature had in view, one being

within its authority and the other not, the language must be given a broad and liberal interpretation, and an endeavor made to apply the act to the object within the legislative authority. All presumptions are resolved in favor of the constitutionality of a statute, and when doubt is entertained its language should be given that construction which will sustain it. (*The People, ex rel. Sinkler, v. Terry,* 108 N. Y. 1, 14 N. E. 815; *Miller v. Dunn,* 72 Cal. 462, 14 Pac. 27, 1 Am. St. Rep. 67; *City of San Diego v. Granniss,* 77 id. 511, 19 Pac. 875; *Mauldin v. City Council,* 42 S. C. 293, 20 S. E. 842, 27 L. R. A. 284, 46 Am. St. Rep. 723; *Wenger v. Taylor,* 39 Kan. 754, 18 Pac. 911.)

We confess to great difficulty in determining the object of the act under consideration. The title expresses it in this way:

"An act to provide for a branch penitentiary and oil-refinery in connection therewith, the issuance of bonds for said purpose, and making an appropriation therefor, and for the payment of principal and interest on said bonds." (Laws 1905, ch. 478.)

The title indicates that it was the intention to build and maintain a branch penitentiary, and also to build an oil-refinery. Section 1 provides:

"For the purpose of providing proper employment for convicts confined in the state penitentiary, the warden of the Kansas state penitentiary is hereby empowered, by and with the advice of the board of directors of said penitentiary, to secure, without expense to the state, a suitable site for the erection of a branch of the state penitentiary and oil-refinery at Peru." (Laws 1905, ch. 478.)

Here again appears the double purpose—a branch of the state penitentiary, and an oil-refinery. The subsequent provisions of the section do not indicate an intention to build a branch of the state penitentiary, but go into great detail for the construction, maintenance and operation of an oil-refinery for the manufacture of crude and refined oil and its by-products,

and the warden of the state penitentiary is required to keep such refinery in repair and furnish the requisite machinery, equipments and instrumentalities for receiving, manufacturing and storing crude and refined oil, and marketing the same. No reference is made to the construction or maintenance of a branch of the state penitentiary, its dimensions, the number of rooms, the material of which it shall be constructed, or that any shall be constructed.

Section 2, however, makes some reference to a branch penitentiary, but closely connects it with the oil-refinery. It provides that in "constructing, maintaining and operating such branch penitentiary and oil-refinery, said warden and board of directors are hereby authorized to employ convicts in the state penitentiary." The latter part of this section makes a specific provision with reference to a so-called branch of the state penitentiary, authorizing the officials to provide "suitable and humane facilities for the housing, feeding, guarding and overseeing of said convicts and the work to be performed by them."

The only other reference in the act to the construction of a branch penitentiary is in section 3, where an appropriation of $10,000 is made for the construction of suitable quarters and facilities for housing, feeding, guarding and overseeing the convicts at the branch penitentiary. It also makes an appropriation of $200,-000 for the construction of an oil-refinery plant, and $200,000 more for operating and keeping the same in repair, the purchase of crude oil, and the expense of receiving, refining, storing, handling and marketing its products.

From these provisions alone it is doubtful whether the primary object of the bill was to build a branch penitentiary at Peru, where oil is produced in great quantities, and incidentally thereto, and for the purpose of furnishing employment to the convicts confined therein, to build and operate an oil-refinery, or

whether it was to construct and operate an oil-refinery plant in this oil-field, and operate it, so far as possible, by convicts in the state penitentiary, with such provisions, and only such, for the housing, guarding and feeding of such convicts as would be necessary for their care while employed in the refinery. But for the rule previously stated—that all presumptions are in favor of the constitutionality of a statute and that all doubts should·be resolved in support of it—and but for other means of information than the language of the act, we would be strongly inclined to hold that the legislature regarded the building and operating of the oil-refinery as of paramount importance.

Where, however, an act is so ambiguous, indefinite and uncertain that it is doubtful which of two objects the legislature had in mind, the court, for the purpose of determining the legislative intent, may resort to other means of interpretation than the language used in the statute.

The history and conditions of the people within the jurisdiction of a court at the time of the passage of an act which it is called upon to construe for the purpose of determining its validity are familiar to a court, and its knowledge of the same should aid it in assuming the proper viewpoint from which to discover the object of the law—particularly a law of the nature of the one under consideration. The history of a state, which should include the facts surrounding the enactments of its legislature and the questions therein raised upon the passage of every law of an economic nature, as well as the doings of its people and the public questions which have agitated their minds, is known by a court. If the act under consideration be one passed immediately before a court is called upon to construe it, the court is as familiar with the conditions of the people as any well-informed citizen of the state. It knows that in certain portions of the state large areas are devoted to the growing of wheat,

The State v. Kelly.

while in other portions the farming of that cereal is not practicable. It knows that the same is true of corn and other crops. It knows that certain parts of the state require irrigation to make farming profitable, while in other parts the precipitation is generally sufficient. It knows that in certain counties large deposits of coal are found, and that in others large fields of oil and gas have been discovered. It knows the enterprises of the people of the state in a business way quite as well as it understands the agricultural conditions. It also knows those general facts concerning the public aims and interests of the state in social and economic ways which all well-informed people know, including the questions that agitated the public mind at the time this certain law was enacted, and knows the history of the constitution and the reason for the adoption of certain provisions and the rejection of others.

A court cannot devest itself of the knowledge of all these things in construing a statute or constitutional provision, even if it were disposed so to do. The consideration of this knowledge without proof of the facts is generally termed "judicial notice," and, for the want of a better expression, it will suffice; but the term means no more than that courts, in construing the law, will bring to their aid all those facts which are known by all well-informed persons because they are matters of public concern.

Authority for taking into consideration the history of an enactment and the conditions of the people of the state at that particular time is abundant. The following seem particularly apt, and for that reason are herewith produced. The supreme court of the United States was called upon, in the case of *Johnson v. Southern Pacific Co.*, 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363, to put a construction on the second sec-

52—71 KAN.

tion of the act of March 3, 1893 (27 Stat. at L., p. 531, c. 196), entitled:

"An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes."

The section under consideration in that case reads as follows:

"SEC. 2. That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

The act also provided:

"That from and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive-engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system." (Enacting clause.)

On page 15 of the opinion it was said:

"The present case is that of an injured employee, and involves the application of the act in respect of automatic couplers, the preliminary question being whether locomotives are required to be equipped with such couplers. And it is not to be successfully denied that they are so required if the words 'any car' of the second section were intended to embrace, and do embrace, locomotives. But it is said that this cannot be so because locomotives were elsewhere in terms required to be equipped with power driving-wheel brakes, and that the rule that the expression of one thing excludes another applies. That, however, is a question of intention."

The court proceeded to show by argument that the

word "car" used in the act was intended to apply to locomotive-engines, and then follows this statement, on page 19:

"And its intention is found 'in language actually used, interpreted according to its fair and obvious meaning.' *United States v. Harris,* 177 U. S. 305, 309, 20 Sup. Ct. 609, 44 L. Ed. 780.

"That this was the scope of the statute is confirmed by the circumstances surrounding its enactment, as exhibited in public documents to which we are at liberty to refer. *Binns v. United States,* 194 U. S. 486, 495, 24 Sup. Ct. 816, 48 L. Ed. 1087; *Holy Trinity Church v. United States,* 143 id. 457, 463, 12 Sup. Ct. 511, 36 L. Ed. 226.

"President Harrison, in his annual messages of 1889, 1890, 1891, and 1892, earnestly urged upon congress the necessity of legislation to obviate and reduce the loss of life and the injuries due to the prevailing method of coupling and braking. In his first message he said: 'It is competent, I think, for congress to require uniformity in the construction of cars used in interstate commerce, and the use of improved safety appliances upon such trains. Time will be necessary to make the needed changes, but an earnest and intelligent beginning should be made at once. It is a reproach to our civilization that any class of American workmen should, in the pursuit of a necessary and useful vocation, be subjected to a peril of life and limb as great as that of a soldier in time of war.'

"And he reiterated his recommendation in succeeding messages, saying in that for 1892: 'Statistics furnished by the interstate commerce commission show that during the year ending June 30, 1891, there were forty-seven different styles of car-couplers reported to be in use, and that during the same period there were 2660 employees killed and 26,140 injured. Nearly 16 per cent. of the deaths occurred in the coupling and uncoupling of cars, and over 36 per cent. of the injuries had the same origin.'

"The senate report of the first session of the fifty-second congress (No. 1049), and the house report of the same session (No. 1678), set out the numerous and increasing casualties due to coupling, the demand for protection, and the necessity of automatic couplers, coupling interchangeably. The difficulties in the case

were fully expounded and the result reached to require an automatic coupling by impact so as to render it unnecessary for men to go between the cars; while no particular device or type was adopted, the railroad companies being left free to work out the details for themselves, ample time being given for that purpose. The law gave five years, and that was enlarged, by the interstate commerce commission as authorized by law, two years, and subsequently seven months, making seven years and seven months in all."

In *Division of Howard Co.*, 15 Kan. 194, it was said:

"The courts will take judicial notice, without proof, of all the laws of the state; and, in doing so, will take judicial notice of what the books of published laws contain, of what the enrolled bills contain, of what the legislative journals contain, and indeed of everything that is allowed to affect the validity or meaning of any law in any respect whatever."

This principle was again announced in *City of Topeka v. Gillett*, 32 Kan. 431, 4 Pac. 800; and in *LaRue v. Insurance Co.*, 68 id. 539, 75 Pac. 494, it was said:

"Courts of this country take judicial notice that under the treaty of Paris, between the United States and the kingdom of Spain, signed December 10, 1898, the Philippine islands became a part of our territory, and that after that time the inhabitants of those islands were in a state of insurrection against the government."

These, like all other public matters, being of general concern to the people, were known to this court, as they were to all other well-informed persons, and therefore the insurance policy in that case was construed in the light of existing conditions.

"In determining the intent of the legislature the court is not limited to a mere consideration of the words employed, but may properly look to the purpose to be accomplished, the necessity and effect of the statute, under the different constructions suggested." (*City of Emporia v. Norton*, 16 Kan. 236.)

"The persons whose duty it may be to inspect the act with a view to the determination of that question

are not required to devest themselves of all knowledge save that to be gleaned from the act alone. For, were it possible for them thus to devest themselves, the act would be unintelligible—a jumble of words without meaning. So, when we say that the question is to be determined by an inspection of the act itself, we imply that those under whose inspection it is brought will scan it in the light of that knowledge which they possess in common with other men. There is no presumption that courts are ignorant of all matters that transpire outside the court-room. On the contrary, there are many matters outside the science of the law of which they are required to take judicial notice." (*Redell v. Moores*, 63 Neb. 219, 226, 88 N. W. 243, 245, 55 L. R. A. 740, 93 Am. St. Rep. 431.)

The principle is stated thus in section 77 of Bishop on Statutory Crimes, third edition:

"They [courts] do not close their eyes to what they know of the history of the country and of the law, of the condition of the law at the particular time, of the public necessities felt, and other like things."

"Courts are authorized to collect the intention of the legislature from the occasion and necessity of the law—from the mischief felt, and the objects and remedy in view." (*Sibley v. Smith et al.*, 2 Mich. 486, 487.)

"But courts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it." (*United States v. Union Pacific R. R. Co.*, 91 U. S. 72, 79, 23 L. Ed. 224.)

"Courts will take judicial notice, without proof, of events which are generally known within the limits of their jurisdiction." (*State, ex rel. Thayer, v. Boyd*, 34 Neb. 435, 51 N. W. 964.)

"In construing a constitution or law, the history of its passage through the convention or legislature is often of great assistance." (*Minnesota and Pacific Railroad Company v. H. H. Sibley*, 2 Minn. 13, 19.)

"Constitutions as well as statutes are to be construed in the light of previous history and surround-

ing circumstances. . . . On looking into the debates and journal of the convention which framed the constitution, we find much to confirm this view of the real object and purpose of this section." (*Kennedy v. Gies,* 25 Mich. 83.)

From the last statement it clearly appears that in the determination of the question presented to the court in that case it had consulted the debates and the journal of the convention which framed the constitution.

"The respective journals of the senate and house of representatives, containing the proceedings in reference to a bill enacted into a statute, may be looked to by the courts to ascertain the intention of the legislature in enacting such a statute, if it be ambiguous." (*Edgar v. The Board of Commissioners of Randolph County,* 70 Ind. 331, 332.)

Judge Cooley, at page 101 of the seventh edition of his work on Constitutional Limitations, says:

"When the inquiry is directed to ascertain the mischief designed to be remedied or the purpose sought to be accomplished by a particular provision, it may be proper to examine the proceedings of the convention which framed the instrument."

"But when the meaning of words is doubtful, and where it is seen that the same words have different meanings when employed under different circumstances, or to effect different objects, resort may be had to extrinsic circumstances (*Smith v. Helmer,* 7 Barb. 416), and the courts may seek for that intent in every legitimate way." (*The People v. Schoonmaker,* 63 Barb. 44, 47.)

A similar case was *The Mohawk Bridge Co. v. The Utica & Schenectady R. R. Co.,* 6 Paige (N. Y.) 554. It was there said (at page 561):

"It is only necessary to advert to facts of public notoriety to enable us to understand the language used by the legislature."

"Constitutions are to be construed as the people construed them in their adoption, if possible; and

the public history of the times should be consulted, and should have weight in arriving at that construction." (*Bay City v. The State Treasurer,* 23 Mich. 499.)

Statutes are but public sentiments enacted into laws, and frequently the policy of such legislation is the subject of much public discussion, both before and at the time of its enactment. In construing it courts may not shut their eyes to these public discussions. They are proper matters of consideration in determining the legislative intent, and should be considered for that purpose in the construction of an act growing out of such discussion.

In common with all other well-informed persons this court knows of the great quantities of crude oil that were discovered in a part of the state; the rapid development of this field of industry; the general public complaint that a particular corporation was unjustly manipulating the market of this product so that the producer was being deprived of what rightfully belonged to him; that a public demand was made upon the legislature of 1905 to enact some law which would protect the producer from the further encroachments of this corporation upon his rights.

The senate journal of that legislature shows that on January 12, 1905, senate bill No. 30 was introduced by Senator Porter, with the following title:

"An act to provide for the construction, maintenance and operation of a state oil-refinery, and to provide the necessary funds for such construction, maintenance, operation, and management, and to place the operation and management thereof under state control." (Page 38.)

On January 16 senate bill No. 30 was read a second time, and referred to the committee on oil and gas. (Page 50.)

February 3, 1905, under the head of "Reports of

Standing Committees," the committee on oil and gas made the following report:

"Mr. President: Your committee on oil and gas, to whom was referred substitute for senate bill No. 30, An act in relation to the employment of convicts in the state penitentiary, and in relation to the construction and operation of a state oil-refinery in connection therewith, have had the same under consideration and instruct me to report the bill back to the senate with the recommendation that it be passed.—S. S. BENEDICT, *Chairman*." (Page 200.)

This report refers to substitute for senate bill No. 30, but the journal does not show that a substitute was introduced in the senate.

On February 7 the committee of the whole made the following report:

"Mr. President: The committee of the whole senate have had under consideration bills on the calendar under the head of 'Special Orders,' and I am directed to report as follows:

"Recommended that substitute for senate bill No. 30, An act to provide for the construction, maintenance and operation of a state oil-refinery, and to provide the necessary funds for such construction, maintenance, operation, and management, and to place the operation and management thereof under state control, be passed as amended.—I. D. YOUNG, *Chairman*." (Page 224.)

The senate journal of February 8, under the head of "Presentation of Petitions," contains the following petition offered by Senator Porter of Crawford:

"To the Honorable Senate and House of Representatives of the State of Kansas in legislature assembled:

"The undersigned petitioners, citizens of Cherokee, Kan., and vicinity, respectfully call your attention to the fact that Kansas petroleum, one of the most staple articles that constitutes the natural wealth of the state, is rapidly falling into the hands of the most arrogant and despotic trust in the world, which, by the ownership and monopoly of such products, is not only stifling industry in this state, but extorting millions

The State v. Kelly.

of dollars every year from the people of Kansas by setting its own price on our state products. Therefore, your petitioners respectfully ask that some legislative enactment be granted by which the state may own and operate a number of plants throughout the oil-fields for the refining, distribution and sale of oil. Your petitioners fully believe that such action on your part would not only be for the best interests of the state, but it would be in accord with the will of a large majority of the citizens." (Page 226.)

On February 8, under the head of "Third Reading of Bills," the journal shows that the substitute for senate bill No. 30 passed, under the following title:

"An act to provide for the construction, maintenance and operation of a state oil-refinery, and to provide the necessary funds for such construction, maintenance, operation, and management, and to place the operation and management thereof under state control." (Page 230.)

On the motion of Senator Smith of Edwards, the title was amended to read as follows:

"An act to provide for a branch penitentiary and oil-refinery in connection therewith, the issuance of bonds for said purpose, and making an appropriation therefor, and for the payment of interest on said bonds." (Page 231.)

The senate journal of February 17 (at page 367) shows that the governor transmitted to the legislature his special message approving senate bill No. 30, as follows:

*"To the Senate and House of Representatives:*

"The enactment of so important a piece of legislation as the bill providing for the establishment of an oil-refinery in this state is such a radical departure from governmental precedent that it seems wise to put upon the records a clear statement of the provocation and purpose of this undertaking.

"It is due to the legislative as well as the executive department of state that this be done, that our action be clearly defined and thoroughly understood at home and abroad.

"The causes leading up to this legislation are well known. About twelve years ago oil in vast reservoirs was discovered beneath the soil in southeastern Kansas. Private capital rapidly sought investment in these widening fields of subterranean wealth. Thousands of our people and many citizens from other

states invested their hard earnings in these fields. The Standard Oil Company encouraged these investments by offering remunerative prices for the crude product. Thus encouraged, thousands of our people invested their all in oil-wells, and in the five or six counties covered by the discovery there was for a few years a wonderful impetus to material development. Towns sprang up like magic, and villages grew into cities. At the high tide of this prosperity, encouraged and stimulated by the Standard Oil Company, this great corporation, in harmony with its tactics elsewhere, commenced a systematic absorption of this vast wealth, which threatens to bankrupt these countless private investors and to depreciate and destroy the honest efforts of all the people for the upbuilding of that part of the state. Under one pretense and another crude oil has been depreciated more than one-half in price, while the final product, kerosene, has been increased in cost to the consumer.

"This has been the history of this powerful and rapacious corporation in all of its fields of operation. Unable to cope singly and individually with this powerful commercial combatant, the people immediately affected came to the legislature asking relief at its hands, and their request has been seconded with wonderful unanimity by sympathetic people all over the state. This law is the result. Scarcely a man can be found in whose bosom throbs the desire for fair play who does not sympathize with the spirit and sentiment which inspired this movement. There have been, and are, however, widely divergent views as to the wisdom of this and other remedies proposed to right these recognized wrongs. These divergent views have been honestly and conscientiously entertained. Many have doubted the wisdom and possible effectiveness of this particular measure. I myself have believed that all the desired results to be attained by this appropriation could be accomplished by an appropriation of $50,000. I believe the expenditure of that sum for the establishment of an experimental refinery at Lansing would have eliminated the constitutional question and subserved all the possible purposes to be subserved by the larger apropriations. By experiment I do not mean, as some seem to suppose, an experiment along mechanical lines, for no experiment is needed of this kind; but I mean an experiment, first, which shall definitely and authoritatively settle the question as to the possibilities and profits of the refinery business. These matters are in endless dispute. No one knows about them except experts, and they won't tell. Secondly, as to the legality of my undertaking of this kind; and thirdly, an experiment in a small commercial way on a competitive market.

"The difference between my plan and the one adopted is one of degree and relative expense, and I still think the chances of success would have been greater and the possibilities of failure less. I think Kansas could well afford to make such an official contribution to the great discussion going on in this country on this subject, and help materially in this way to a wise final solution of the problem. I am aware of the transportation and other difficulties involved in this proposition, but I believe they could all be easily overcome. These views, however, have not prevailed; other counsels, and, I trust, wiser ones, have had supremacy.

"It is due to this state to say that this movement has not

The State v. Kelly.

been conceived, as many suppose and some charge, in the spirit of socialism. It is not, indeed, a socialistic movement, but the very reverse of it. True, it has the semblance of socialism, but its soul is that of competition. Its garb is socialistic, but its real person is competitive. What is socialism? It is a heresy which I have studied and combatted for years, and of whose fallacy I am more than ever convinced; a heresy which has extensive literature, ancient and modern, the fundamental tenet of which, so far as material matters are concerned, is the negation of property rights in individuals—the denial of the right of individuals to own property. Its profoundest philosophers have all taught that personal ownership of property is a crime. Is this oil-refinery movement tinctured at all with this heresy? I answer, emphatically, No.

"No one denies the right of the Standard Oil Company to own oil properties or to deal in oils. This company has invested vast sums of money in Kansas, and certainly no one has objected to these investments; they have been gladly welcomed, as are all legitimate investments, and are entitled to the protection accorded to all other investments. It is not the possession and exercise of these property rights, but the abuse of them, to which objection is made. This is not an attempt to drive the Standard Oil Company out of Kansas, to deprive it of legitimate profits, or to do it any injustice of any kind—it is an attempt to compel it to treat the people of this state fairly, and to give every man a square deal. If this state refinery succeeds it will not attempt to monopolize the oil business of this state—it has no such purpose in view. It is not an attempt to establish a monopoly, but it is an attempt to compel a monopoly already existing to be decent. It will not discourage, but encourage, private investment in this line of industry. It will welcome all such investments. It is an attempt to make competition possible, and not to destroy competition, as socialism does; and when its purpose is achieved, when private capital can come to Kansas and find investment in oil-refineries, with a fair chance of success, when normal conditions have been restored, when individual competition shall again be possible, when these good conditions have been made permanent, then the state will not only be willing, but will be glad, to retire from the refining of oil, and leave that business as well as the other lines of industry in the hands of private competitors, where it legitimately belongs, but where it is now impossible, on account of the greatest socialistic corporation now doing business on earth, the Standard Oil Company.

"No greater question confronts the American people than the control of these great aggregations of capital, all of them socialistic in their character, and which are antagonistic to the essential element of all national progress, the competitive system. A timely and significant illustration of the coercive character of these modern combinations of capital, and of their menace to private and public weal, was furnished in the recent telegram of the manager of the Standard Oil Company petulantly and arbitrarily withdrawing its patronage from the producers in the oil-fields. Were that order maintained thousands of good people would soon be bankrupt and homeless. An economic condition which makes it possible for one man with a stroke of his pen to bankrupt thousands of his fellow citizens is

inherently wrong and will not be permanently tolerated by a free and patriotic people, and it illustrates more forcibly than any recent event has done the necessity of a wise solution of this whole trust problem. Playful resolutions have been introduced into this legislature for the control of other trusts; but the question is a serious one, and I have the utmost faith that the intelligent, patriotic and courageous American people will find a solution for all of these problems. We are all groping in the dark, but we will get out into the light after a while. This Kansas contribution to the solution of this great problem may or may not be a wise one, but it is at least an honest and courageous one. A free people had better fail in an attempt to defend their rights than to make no attempt in this direction at all.

"Differing somewhat as to methods, but in hearty sympathy with the purpose of this enactment, I have given it my approval, and will exert whatever power I may possess to the fullest extent to make this undertaking a success, and I call upon all patriotic people of the state, now that their representatives have spoken, to lay aside individual opinions and personal predilections and unite in the support of a common cause. I wish again to call the attention of the legislature to a suggestion formerly made, that no undertaking of this kind can succeed unless supplemented by adequate railroad legislation, for by the manipulation of railroad rates by the Standard Oil Company in its own self-interests, to the detriment of independent refineries, is due largely the present unfortunate condition of affairs; and it is absolutely useless to spend a dollar of the people's money in the manner provided by this bill unless this legislation be supplemented by a law protecting this enterprise, as well as other individual competitive enterprises, from the unjust discriminations and extortions which have crippled and crushed competitive efforts in the past.

"Incidentally, I may suggest to the legislature that, as this law imposes heavy additional duties upon the warden and directors of the penitentiary, the latter of whom are already poorly paid, additional remuneration should be provided for them.                                   E. W. HOCH, *Governor*."

The executive sustains a more direct and intimate relation to the people than any other official. He knows and understands the conditions, desires, aspirations and aims of each community. The bill in question, having originated, as expressed in the message, in a popular demand for relief against a "powerful commercial combatant," against which the individual was unable to cope, met the hearty and enthusiastic approval of the governor, not as an appropriation to build a branch of the state penitentiary but as an appropriation for the construction and operation of an oil-refinery; and, inasmuch as no reference is made to

The State v. Kelly.

the branch penitentiary, it may be said that the governor did not understand that there were any provisions in the bill which seriously contemplated the building of a branch of the state penitentiary. The governor discloses his apprehension of the constitutionality of this bill in his comparison of the feasibility of the many plans which had been suggested for the repression of the greed of this "rapacious corporation" with his own, which was to appropriate $50,000 for an experimental refinery at Lansing. He said:

"I believe the expenditure of that sum for the establishment of an experimental refinery at Lansing would have eliminated the constitutional question and subserved all the possible purposes to be subserved by the larger appropriations."

This constitutional provision is a limitation placed by the people in their paramount law upon the power of the legislature, preventing it from diverting the energies of the state from public and governmental functions into private and business enterprises. No circumstances can arise which will justify its violation by any governmental department. It is a protection against a particular class of ill-advised or rash legislation resulting from a distempered public sentiment, which requires only cooling time for its proper adjustment.

If, as contended by the state, the object of the bill is to construct a branch penitentiary, it seems strange that the governor in approving it should feel called upon to say that it "is such a radical departure from governmental precedent that it seems wise to put upon the records a clear statement of the provocation and purpose of this undertaking, . . . that our action be clearly defined and thoroughly understood at home and abroad." The construction of penal institutions is not a "radical departure from governmental precedent." The "provocation" for maintaining such institutions is known to all persons. Besides, what interest

have the people abroad in the subject of our penal institutions that for their benefit "our action be clearly defined"? The indictment of the Standard Oil Company in the message is no doubt true, and the provocation was very great, but

"We must not make a scarecrow of the law,
Setting it up to fear the birds of prey."

The consideration of the bill in the light of the public conditions under which it was conceived, the title under which it was introduced in the senate, the bill itself, and its reference by the senate to its committee on oil and gas instead of to its committee on penal institutions, the passage of the bill by the senate under its original title and the purpose of the bill and the reasons for its passage as expressed by the governor in his special message of approval leave no doubt in our minds that the object of the bill was to secure a site whereon the state should construct, operate and maintain an oil-refinery, and that in so far as the warden and board of directors of the state penitentiary might think advisable they could employ in the construction of the building and maintaining and operating the refinery inmates of the state penitentiary, and for this reason provisions were made for housing, feeding, guarding and overseeing such convicts, and the work to be performed by them while thus engaged.

The bill, being an appropriation for the construction, operation and maintenance of an oil-refinery, which is a "work of internal improvement" within the provisions of section 8, article 11, of the state constitution—which provides that "the state shall never be a party in carrying on any works of internal improvement"—is void. This or similar provisions are found in the constitutions of nearly all the states. The history of those states that have engaged in works of internal improvement under constitutions which contain no such inhibition, as well as those whose constitutions contain provisions authorizing the state to engage in such works, is not only interesting but instructive. It

will suffice for our purpose to repeat the story of the
disasters which followed such attempts in those states,
as told in the case of *Attorney General v. Pingree,* 120
Mich. 550, 554, 79 N. W. 814, 815, 46 L. R. A. 407:

"Is the act contrary to section 9, article 14, of the
constitution? The section reads as follows: 'The state
shall not be a party to, or interested in, any work of
internal improvement, nor engage in carrying on any
such work, except in the expenditure of grants to the
state of land or other property.'

"It is doubtless true, as urged by counsel, that the
state legislature is given a general grant of legislative
power, and that its power to legislate is subject only
to such limitations as are imposed thereon by the ex-
press or implied limitations contained in the constitu-
tion of the state or the constitution of the United
States. To understand the force and effect of the pro-
visions of our constitution in relation to the attitude
of the state toward internal improvements, it may be
well to consider the experience of other states and of
our own state prior to the adoption of our present con-
stitution. The war of 1812 demonstrated the great
need of a better system of intercommunication between
the various portions of the country. The condition of
the highways, both land and water, was such that
troops and provisions could be moved but slowly and
at great expense. This was also true of the products
of the country. Succeeding the war of 1812, the state
of New York entered upon the construction of the Erie
canal. Its construction was doubtless of great benefit
to the agricultural and commercial interests of the
state, and especially to the city of New York. Other
states were prompted to follow the lead of New
York, and projected the digging of canals, the im-
provement of waterways, and the construction of rail-
roads.. Nearly all the state constitutions adopted
between 1830 and 1850 either gave the legislature per-
mission, or made it mandatory, to 'encourage internal
improvements within the state.' Many enterprises of
this character were entered upon which were ill-
advised. So many of them were undertaken, many of
the states incurred obligations they were unable to
meet. The rate of interest in these new countries
was much higher than capital commanded in Europe.
Money from there after 1830 was furnished almost

without limit, to be invested in the various projects devised by the several states. The state debts increased from $13,000,000 in 1830 to $100,000,000 in 1838. After the financial crisis of 1837 came, foreign capitalists who sought to draw out this money were unable to do so. An effort to collect these obligations proved abortive. Upon one pretext or another, many of the states repudiated their debts made for internal improvements. The states most disastrously affected were Maryland, Pennsylvania, Indiana, Illinois, Louisiana, Mississippi, and our own state. (2 Cycl. Pol. Science, 571.)

"For the period between 1835 until the financial panic of 1837 occurred, the state of Michigan had a wonderful growth. The opening of the Erie canal, and the facilities for travel furnished by the great lakes, made it comparatively easy for the residents of New York, New Jersey and New England who were seeking to better their condition to reach our borders. The climate was good, and the soil was fertile. The example of New York in constructing works of internal improvement was thought worthy of imitation. The constitution adopted upon the admission of the state into the union provided: 'Internal improvement shall be encouraged by the government of this state; and it shall be the duty of the legislature, as soon as may be, to make provision by law for ascertaining the proper objects of improvement in relation to roads, canals, and navigable waters, and it shall also be their duty to provide by law for an equal, systematic, economical application of the funds which may be appropriated to these objects.' Const. 1835, art. 12, §3.

"The governor of the new state, in a message to the legislature, called its attention to its duty to act under the constitutional provision. The legislature was not slow to respond. A canal was projected from Mt. Clemens to the mouth of the Kalamazoo river, and one around the falls of the St. Mary. A number of state railroads were surveyed, and their construction entered upon. To meet the expense, the governor was authorized to borrow, upon state bonds issued for the purpose, $5,200,000. These bonds were all negotiated, though, owing to the failure of one of the companies and one of the banks which undertook to negotiate them, the amount for which they were negotiated never found its way into the state treasury. It be-

came evident the amount of the loan would not begin to complete the internal improvements already begun. Then came the financial panic. Bankruptcy and financial ruin were upon every hand. The state, at a great sacrifice of its property, made an arrangement with its creditors which left its credit good, but left it very badly in debt. . . .

" 'Having all their bitter experience with internal improvements fresh in mind, when they formed a new constitution, in 1850, the people resolved to put it out of the power of the legislature again to involve them in extravagant projects. And here we reach another landmark, significant in itself, but especially notable when contrasted with the provision respecting internal improvements which has already been quoted from the constitution of 1835. In 1850 the people deemed it necessary to prohibit what in 1835 they commended; and they now provided that "the state shall not subscribe to, or be interested in, the stock of any company, association, or corporation," and also that "the state shall not be a party to, or interested in, any work of internal improvement, nor engage in carrying on any such work, except in the expenditure of grants to the state of land or other property." These were very positive provisions, and by adopting them the people believed they had rendered it impossible that projects of doubtful wisdom and utility should be engaged in at the public cost.' (Cool., Hist. Mich. 289.) "

As expressed by the attorney-general in his brief, referring to this history of such legislation, "this evolution of the constitution had already taken place and was written history at the time our own fundamental law was framed"; and to this we may add that the members of our constitutional convention were perfectly familiar with the history of the section now under consideration when they wrote our constitution. This fact is disclosed by the following extracts from the proceedings of the Wyandotte constitutional . convention:

"Mr. Hoffman offered the following as an additional section:

" 'SEC. 8. The state shall never be a party in con-

structing and carrying on any works of internal improvement; but whenever grants of land or other property shall have been made to the state for particular works of internal improvement, the state shall devote thereto the avails of such grants, and may pledge the revenues derived from such works in aid of their completion.'

"Mr. Parks proposed to amend so as to read as follows:

" 'SEC. 8. The state shall never contract any debt for works of internal improvement, or be a party in carrying on such works.'

"Mr. Stinson proposed to strike out and insert in place of the last words, the following:

" 'And shall never be a party to carrying on works of public improvement.'

"Mr. Stinson: 'It seems to me, Mr. President, that every safeguard that could be desired has already been thrown about the power of the legislature to contract a public debt for the future state. And gentlemen who propose these additional sections in regard to works of public improvement seem to wish to hamper not merely the legislature but also the people. I think that it would be necessary to prescribe that a majority of the people shall first declare in favor of a state debt; and I do not want to restrain the people even in the matter of contracting debts, nor in any other legitimate control of their own interests. Nor do I think it important to say that it will not be to the interest of the state to loan its credit for purposes of internal improvement. Suppose several millions of acres of land were granted to the state of Kansas for the purpose of carrying on great works of internal improvement, it seems to me that frequently cases might arise wherein the state should advance money for these works, and take land for security, rather than give them up to the mismanagement of companies, or perhaps sacrifice them altogether by throwing them into the hands of speculators. For if the lands go into the hands of the companies, they will be compelled to go on with forced sales, thereby keeping the lands out of the hands of the actual settlers. If we should have, say, four hundred millions of acres of land granted to the state, I would be in favor of having a state preemption law for settlers, in which the state should be

made liable for the settlers' payment for their lands—taking the land for security. But now, by this provision, this matter is not in the hands of the legislature, but the people. It is carefully and industriously guarded, and any attempt to restrict the people in the exercise of this right is to legislate against the people, and not to throw a safeguard around their representatives.'

"Mr. Parks: 'Mr. President, the theory of the gentleman may be very fine, but his theory in the practice of other states has worked very badly for the people. I refer particularly to the state of Indiana, which many years ago went into a system of internal improvements, from which they have scarcely yet recovered. It is this working of the principle of an unlimited public debt that I wish to cut off. . . .'

"Mr. McDowell: 'If I recollect the position of the report, the convention, when it adjourned, was considering an amendment by my colleague, Judge Parks.'

"The secretary reported the condition of the question at the time of the adjournment to be as follows:

"Mr. Hoffman had offered the following section, to be added to the article:

" 'SEC. 8. The state shall never be a party in constructing and carrying on any works of internal improvement, and whenever grants of land or other property shall have been made to this state for particular works of internal improvement, the state shall donate thereto the avails of such grants, and may pledge the revenues derived from such works in aid of their completion.'

"And then—

"Mr. Parks had proposed to amend the amendment, so as to read as follows:

" 'SEC. 8. The state shall never contract any debt for works of internal improvement, or be a party in carrying on such work.'

"Mr. Stinson: 'My recollection is, that Judge Parks's proposition was introduced as a substitute for the section proposed by the gentleman from Woodson (Mr. Hoffman), and that I offered an amendment to the former, to strike out and insert, so as to make it read: "The state shall never be a party to carrying on works of public improvement." '

"Mr. Thacher: 'Mr. President, if it is in order to

amend the proposition of the gentleman from Woodson, I think the word "particular" ought to be stricken out.'

"The President: 'In the opinion of the chair, the amendment of the gentleman from Leavenworth (Mr. Stinson), being a substitute for the whole, ought to be considered first.'

"Mr. Stinson's substitute was adopted on a division —affirmative 25, negative 13; and so the section, as amended, was adopted into the article." (Proc. Const. Con., pp. 229, 230, 233.)

On July 29, 1905, forty-six years will have passed since this convention completed its work and adjourned. Of the thirty-three persons who signed the constitution, all but Benjamin F. Simpson, John Taylor Burris, S. D. Houston and Edmund G. Ross have joined the majority, and this is the first time that it has become necessary to invoke the aid of this provision of the constitution to protect the state in its sovereign capacity from the public disaster that history shows would follow its engaging in a purely private business enterprise. It has been the policy of our government to exalt the individual rather than the state, and this has contributed more largely to our rapid national development than any other single cause. Our constitution was framed, and our laws enacted, with the idea of protecting, encouraging and developing individual enterprise, and if we now intend to reverse this policy, and to enter the state as a competitor against the individual in all lines of trade and commerce, we must amend our constitution and adopt an entirely different system of government.

The peremptory writ is denied.

All the Justices concurring.