No. 31,717

THE STATE, ex rel. ROLAND BOYNTON, Attorney-general, *Plaintiff*, v. THE STATE HIGHWAY COMMISSION, ETC., *Defendant*.

(28 P. 2d 770.)

Opinion filed January 27, 1934.

*Roland Boynton*, attorney-general, *Dunkin Kimble* and *Everett E. Steerman*, assistant attorneys-general, for the plaintiff.

*Wint Smith* and *Gale Moss*, attorneys for the state highway commission, for the defendant; *Kirke W. Dale*, of Arkansas City, *Frank H. McFarland*, of Topeka, and *W. H. Vernon*, of Larned, of counsel.

The opinion of the court was delivered by

HARVEY, J.: This is an original proceeding in quo warranto challenging the authority of the state highway commission to execute and carry out on its part the provisions of chapter 98 of the laws of the special session of the legislature of 1933, and for a declaratory judgment as to the validity of the act. Among other things the petition alleges that, proceeding under this act, defendant is about to enter into a contract with the proper agency of the federal government for borrowing the sum of $17,000,000 to be used

for the purposes expressed in the act, namely, the construction, improvement, reconstruction and maintenance of state highways and bridges; that in conformity with the regulations of such federal agency defendant will be entitled to receive, in addition to the sum borrowed, the further sum of $5,100,000 for such use; that to secure such loan defendant will issue and pledge to such federal agency revenue anticipation warrants, payable serially, in not less than three nor more than thirty years, and create a sinking fund for paying such warrants, with interest at a rate of not more than four per cent, and paying fiscal agency charges, which payments shall not exceed $1,000,000 per year. The petition further alleges the act is invalid, which allegations are put in issue by the answer, for a number of reasons, which are stated and argued under seven heads. We shall discuss these in the order presented:

First. Is the act a valid exercise of the police power of the state? Or, stated more specifically, has the state, through its legislature, power and jurisdiction to provide work for the unemployed, or otherwise care for poor and needy citizens of the state, in view of article 7, section 4, of our constitution, which reads:

"The respective counties of the state shall provide, as may be prescribed by law, for those inhabitants, who, by reason of age, infirmity, or other misfortune, may have claims upon the sympathy and aid of society."

The provision is not self-executing. It requires legislation, and much has been enacted (see R. S. 39-301 to 39-511). There is necessarily vested in the legislature a discretion as to what may be prescribed by law. Passing that thought, in our governmental scheme these things are fundamental: All governmental power primarily is and originally was vested in the people. Some of these governmental powers were granted to the federal government by our federal constitution, the others remained with our people. In the formation of our state constitution some governmental powers were prohibited, others were limited. Except as so prohibited or limited, all governmental power not granted to the federal government remains with the people and may be exercised by them. Normally that is exercised or initiated by legislative enactment. Our constitution nowhere prohibits the state from making provision by legislative enactment for the care of the poor and needy. See *Treadwell v. Beebe,* 107 Kan. 31, 38, 190 Pac. 768, and authorities there cited. To the extent, therefore, that the bill in question attempts to or does furnish relief to the poor and needy it violates no

constitutional provision. However, what is said in the act on that subject is in the nature of a preamble, stating reasons or grounds for enacting the statute. The economic depression mentioned in section 1 of the act is not created by this section, and may not be entirely cured by the act. What is stated in the section is valuable, if at all, in aiding the court to understand the purposes, or some of the purposes, of the legislature in passing the act. (*Block v. Hirsh*, 256 U. S. 135, 65 L. Ed. 865; *State v. Martin*, 23 P. 2d 1 [Wash.]). The validity of the act must be tested by its provisions. The act makes no provision for the relief of poor and needy persons except as some of them may obtain employment in the construction and maintenance of highways contemplated by the provisions of the act.

Second. Is the title of the act valid in view of article 2, section 16, of our constitution, which reads in part:

"No bill shall contain more than one subject, which shall be clearly expressed in its title, . . ."

Primarily this provision is one for the benefit of the members of the legislature to prevent them from being misled or deceived by the title of the bill, but it is one which the legislature should follow, and a clear disregard of it renders the act invalid. While the title to the act in question is more in detail than necessary—it could have been better drawn with fewer words—it cannot be said either to be misleading, or that it deals with more than one general subject.

Third. Does the act confer legislative authority upon (*a*) the governor, (*b*) the state highway commission, in violation of article 2, section 1, of the constitution, which reads:

"The legislative power of this state shall be vested in a house of representatives and senate."

The duties conferred upon the governor and state highway commission are no more than those necessary to be exercised by any administrative officer or board in carrying out the will of the legislature with respect to business transactions, which necessarily call for the use of judgment and discretion.

Fourth. Does the act authorize the withdrawal and expenditure of money over a period of more than two years, in violation of article 2, section 24, of the constitution, which reads:

"No money shall be drawn from the treasury, except in pursuance of a specific appropriation made by law, and no appropriation shall be for a longer term than two years."

This act makes no appropriation for any length of time. It outlines a policy and authorizes a plan of conducting certain state business. Perhaps the statute will call for appropriations from time to time—many of our statutes do—but if so, we cannot assume they will not be made. At any rate, it is clear this act is not invalid for the reason here urged.

Fifth. Does the act, in permitting money from taxation of motor vehicles and motor fuels to be used in payment of a loan made by the government of the United States and interest and carrying charges thereon, violate article 11, section 4, of the constitution, which reads:

"No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same, to which object only such tax shall be applied."

By article 11, section 9, of our constitution the state has power to levy special taxes for road and highway purposes on motor vehicles and on motor fuels. Under this provision the legislature levied special taxes for road and highway purposes on motor vehicles and on motor fuels. Moneys derived from these taxes constitute the state highway fund. The warrants authorized by this act would be drawn upon this fund. Interest and charges paid on any such warrants would be payable from this fund. The fact that interest is paid from a fund upon a warrant drawn on that fund has never been regarded as a diversion of the fund for purposes other than that for which it was raised.

Sixth. The question is presented whether the warrants authorized by the act would be general obligations of the state, or payable solely out of a specific fund. The warrants will not be "general obligations" of the state, if by that term is meant obligations which might be paid from funds produced by a general property tax levy, or by the sale of bonds to be paid by general taxes, for the constitution (art. 11, § 8) specifically provides that for the construction and maintenance of a state system of highways "no general-property tax shall ever be laid nor bonds issued by the state for such highways." If by the term "general obligations" is meant obligations which might be paid out of funds the state may lawfully raise for the construction and maintenance of highways, then the question must be answered in the affirmative. By article 11, section 9, of the constitution the state is given power to levy special taxes for road and highway purposes on motor vehicles and on motor fuels, and most

of the moneys used by the state through its state highway department for the construction and maintenance of the state highways is raised from this source. Perhaps the state might provide other sources of revenue for the state highway fund, so long as it did not levy a general-property tax or issue bonds payable by such a tax for that purpose; but from whatever source moneys might be obtained for the state highway fund (other than by a general-property tax or bonds payable thereby), we see no reason why the warrants are not the general obligation of the state upon the state highway fund. By our constitutional provision (art. 11, § 8) it is the state which is authorized to construct and maintain a state system of highways. By chapter 225 of the Laws of 1929 the legislature created a highway commission to perform those state functions and provided funds for that purpose. It declared the commission "shall be a body corporate, with power to sue and be sued," thus making it a quasi-corporate body to carry forward the work for the state of constructing and maintaining a state system of highways. (*Mc-Candliss Construction Co. v. Neosho County Comm'rs*, 132 Kan. 651, 296 Pac. 720; *Payne v. State Highway Comm.*, 136 Kan. 561, 16 P. 2d 509.) The state has given its consent to be sued by an action against the state highway commission with respect to contracts it is authorized to make or was required to take over. It also has given its consent to be sued for damages under certain circumstances by an action against the state highway commission. (R. S. 1931 Supp. 68-419.) But the state has not given its general consent to be sued for all purposes. (*Barker v. Hufty Rock Asphalt Co.*, 136 Kan. 834, 18 P. 2d 568.) The state highway commission is therefore acting for the state in all of its activities authorized by statute for the construction and maintenance of state highways. The funds which it uses for that purpose are state funds, and the warrants it draws on the fund are state warrants, payable, however, from the fund, and are general as they apply to this fund.

Seventh. Are the warrants which the state highway commission is authorized to issue under this act debts of the state within the meaning of article 11, sections 5 and 6, of the constitution, and hence void in excess of one million dollars unless submitted to and ratified by a vote of the people? These sections read as follows:

"Sec. 5. For the purpose of defraying extraordinary expenses and making public improvements, the state may contract public debts; but such debts shall never, in the aggregate, exceed one million dollars, except as hereinafter

provided. Every such debt shall be authorized by law for some purpose specified therein, and the vote of a majority of all the members elected in each house, to be taken by the yeas and nays, shall be necessary to the passage of such law; and every such law shall provide for levying an annual tax sufficient to pay the annual interest of such debt, and the principal thereof, when it shall become due; and shall specifically appropriate the proceeds of such taxes to the payment of such principal and interest; and such appropriation shall not be repealed nor the taxes postponed or diminished until the interest and principal of such debt shall have been wholly paid.

"SEC. 6. No debt shall be contracted by the state except as herein provided, unless the proposed law for creating such debt shall first be submitted to a direct vote of the electors of the state at some general election; and if such proposed law shall be ratified by a majority of all the votes cast at such general election, then it shall be the duty of the legislature next after such election to enact such law and create such debt, subject to all the provisions and restrictions provided in the preceding section of this article."

Perhaps there are three answers to the question:

*First.* Warrants are not bonds (*Commissioners of Shawnee County v. Carter,* 2 Kan. 115; *Schoenhoeft v. Kearny County,* 76 Kan. 883, 92 Pac. 1097; *Bank v. School District,* 102 Kan. 98, 169 Pac. 202), and ordinarily, at least, are not debts within the meaning of article 11, section 5, *supra.* (*State, ex rel., v. School Fund,* 4 Kan. 261.)

*Second.* The debts referred to in article 11, sections 5 and 6, *supra,* are debts to be paid by a general-property tax. This is clear from the reading of the sections. What the framers of our constitution were guarding against was the incurring of debts in excess of a million dollars payable by a general-property tax without the question having been submitted to and adopted by the people. They regarded property as the basis of taxation (Wyandotte Constitutional Convention, p. 334). They were not dealing with the question of obligations to be paid only by special tax, such as on motor vehicles or motor fuels, or from funds raised in some manner other than by general-property tax.

*Third.* There is another and perhaps more forceful answer to the question. Our original constitution, article 11, section 8, reads:

"The state shall never be a party in carrying on any works of internal improvement."

It will be noted that in article 11, section 5, *supra,* the term "public improvements" is used. By that section, broadly speaking, there were two things for which the state may contract public debt: (*a*) For the purpose of defraying extraordinary expenses, and (*b*) mak-

ing public improvements. It is clear the framers of our constitution used the term "public improvements" in section 5 as meaning something entirely distinct from what was meant by "internal improvements" used in section 8, for the one was permitted, the other prohibited. Although not as full as they might be, the debates in the constitutional convention disclosed this. The term "public improvements," used in section 5, meant public buildings which the state should need in carrying on its functions, such as the statehouse, state penal, educational and eleemosynary institutions (Wyandotte Constitutional Convention, p. 327), while the term "internal improvements," used in section 8, applied to turnpikes, canals and the like. (Wyandotte Constitutional Convention, p. 329; *State v. Kelly*, 71 Kan. 811, 833, 81 Pac. 450.) Some of the members of the convention were familiar with the early history of Indiana and other states which loaded themselves down with obligations for the construction of internal improvements. This they sought to avoid; so it was provided that the state should never be a party to any works of internal improvements. By 1919 our people had reached the conclusion the state might be permitted to carry on works of internal improvements in so far as they pertained to highways, at least to a limited extent, and the legislature of that year (Laws 1919, ch. 331) submitted an amendment to article 11, section 8, of our constitution, which amendment was adopted at the general election in November, 1920, and which reads as follows:

"Sec. 8. The state shall never be a party in carrying on any works of internal improvement except to aid in the construction of roads and highways and the reimbursements for the cost of permanent improvements of roads and highways, constructed after March 1, 1919; but such aid and reimbursement shall not be granted in any county for more than 25 per cent of the cost of such road or highway, nor for more than ten thousand dollars per mile, nor for more than one hundred miles in any one county; except, that in counties having an assessed valuation of more than one hundred million dollars such aid and reimbursement may be granted for not more than one hundred and fifty miles of road or highway; and the restrictions and limitations of sections 5 and 6 of article XI of the constitution, relating to debts and internal improvements, shall not be construed to limit the authority retained or conferred by this amendment."

It should be noted that it was then recognized that the state could not carry on the work of constructing and maintaining state highways, even to the limited extent then provided, if the restrictions and limitations of article 11, sections 5 and 6, of the constitution

should apply to its operations, and it was specifically provided that such sections should not ·apply. Under the above amendment the state undertook, in a limited way, to establish, construct and maintain a state system of highways, but it was found that the limitations provided in this·amendment restricted too much that which the people wished to do in the way of building and maintaining state highways, and at the special legislative session of 1928 (Laws 1928, ch. 3) a new amendment of article 11, section 8, of the constitution was submitted, and with it an additional section to the article (§ 9). These were adopted at the general election in November, 1928. They read as follows:

"SEC. 8. The state shall never be a party in carrying on any work of internal improvement except that it may adopt, construct, reconstruct and maintain a state system of highways, but no general-property tax shall ever be laid nor bonds issued by the state for such highways.

"SEC. 9. The state shall have power to levy special taxes, for road and highway purposes, on motor vehicles and on motor fuels."

At the time of this last amendment of article 11, section 8, *supra,* the thought that the state could not construct and maintain an adequate state system of highways, if it had to be limited and restricted by the provisions of article 11, sections 5 and 6, of our constitution, still prevailed, and it was written into the amendment that "no general-property tax shall ever be laid nor bonds issued by the state for such highway." Clearly the bonds referred to were bonds to be paid by general-property tax, or such bonds as would be authorized by article 11, sections 5 and 6. By this last amendment such bonds for constructing and maintaining state highways, even to the extent of one million dollars, could not be issued by the legislature. Even a general-property tax could not be laid for this purpose. In short, article 11, sections 5 and 6, from the original framing of our constitution through all its amendments, dealt with things entirely different from internal improvements, as that term was originally used and as now used in article 11, section 8, *supra.* With respect to internal improvements, originally our state was prohibited from being a party in carrying them on. When we concluded to permit the state to carry on internal improvements, in so far as they authorized it to construct and maintain a state system of highways, we recognized at once that the limitations of article 11, sections 5 and 6, *supra,* could not be applied to such work or the work could never be accomplished, and in both of the amendments to the

original article 11, section 8, of our constitution, although by different wording, it is made clear that the restrictions of sections 5 and 6 shall not apply.

The provisions of the act in question do not violate article 11, sections 5 and 6, of our constitution.

Some decisions from other states have been cited. They treat the provisions of their respective constitutions, each of which differs materially from the provisions of our constitution which we are called upon to construe. It would serve no useful purpose to refer to and analyze those decisions here.

This court has nothing to do with the prudence of the legislation in question; that was for the legislature to determine. We pass upon the legal questions presented, and find the act not to be invalid for any of the reasons urged against it.

Judgment is entered for defendant.

HUTCHISON, J., not sitting.