No. 31,839

The State of Kansas, ex rel. Roland Boynton, Attorney-general, *Appellant,* v. Giles R. Atherton, Lakin Meade, T. M. Northrup and Alfred M. Landon, as Members of the Forestry, Fish and Game Commission; W. G. Strong, as Secretary of Said Commission; Will J. French, State Auditor, and W. M. Jardine, State Treasurer, *Appellees.*

(30 P. 2d 291.)

Opinion filed March 10, 1934.

*Roland Boynton,* attorney-general, and *Walter T. Griffin,* assistant attorney-general, for the appellant.

*B. N. Mullendore,* of Howard, *R. C. Russell,* of Great Bend, *A. C. Malloy, Roy C. Davis, Warren H. White,* all of Hutchinson, and *Everett E. Steerman,* of Topeka, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This is an appeal from a judgment of the district court denying an injunction asked by the state to restrain the members of the forestry, fish and game commission from the exercise of powers conferred on it by chapter 107 of the Special Session Laws of 1933, the basis of the state's action being that this statute was unconstitutional and invalid in several specified particulars.

The state auditor and state treasurer were impleaded as defendants because of the official duties required of them under the terms of the statute. It reads:

"CHAPTER 107

(Senate Bill No. 158)

"An Act authorizing the forestry, fish and game commission of the state of Kansas to borrow moneys from the United States through the public-works act, the national recovery act and the reconstruction finance corporation to provide for the defraying of extraordinary expenses and making public improvements, and specifying the manner of expenditure of said moneys and the repayment thereof.

"Be it enacted by the Legislature of the State of Kansas:

"SECTION 1. As used in this act, the forestry, fish and game commission of the state of Kansas is designated as the 'commission.' As used in this act, the United States and its agencies created by the public-works act, the national recovery act and the reconstruction finance corporation act are designated herein as the 'federal government.'

"SEC. 2. The commission shall have authority to apply for and secure civilian conservation corps camps, transient unemployment camps, and such other projects as may be made available, designated or required by the federal government.

"SEC. 3. The forestry, fish and game commission is hereby authorized to borrow from the federal government moneys in the aggregate not exceeding $200,000, and as evidence of such indebtedness is authorized to execute and deliver to the federal government such instruments evidencing such indebtedness as may be required by the federal government, and the commission shall have authority to create and extend a lien for the moneys borrowed on the project for which it is advanced.

"SEC. 4. The commission shall use the funds so secured in all matters pertaining to the development of the natural resources pertaining to the control and utilization of water, prevention of soil erosion, flood control and in meeting all preliminary requirements of the federal government in connection therewith, and shall have authority to use said funds to build and construct reservoirs, lakes, dams and embankments for impounding water, on public forestry recreational grounds, and fish and game preserves in the state of Kansas, and in the improving of such recreational grounds and preservations with forest trees, shrubbery and roadways.

"SEC. 5. It is hereby declared to be the purpose of this act to make the repayment by the commission of such loan to the federal government a self-liquidating project, and for such purpose the state treasurer and auditor of state are hereby authorized and directed to set aside and credit ten per cent (10%) of the income of the forestry, fish and game commission, which ten per cent (10%), by virtue of authority of sections 74-3304 and 75-3162b of the 1931 Revised Statutes Supplement and chapter 37 of the Laws of 1933, has heretofore been credited to the general revenue fund of the state, to a special fund for the specific purpose of paying and liquidating the interest and principal of any moneys which may be borrowed by the commission under the authority herein granted: *Provided further,* That the state treasurer and auditor of state shall have authority to draw on and pay out the moneys so deposited in said special fund as may be in accordance with the terms of any contract or stipulation which may be entered into by the commission and the federal government upon vouchers duly approved by the commission: *And provided further,* That sections 74-3304 and 75-3162b of the 1931 Revised Statutes Supplement and chapter 37 of the Laws of 1933 shall be null and void and of no effect in so far as the same may conflict with this act.

"SEC. 6. This act shall take effect and be in force from and after its publication in the official state paper.

"Approved November 23, 1933.

"Published in official state paper November 28, 1933."

The relator alleged that shortly after this statute took effect the defendant Atherton, as vice chairman of the commission, called a meeting of his codefendants of that official body to be held at the office of the governor, who is *ex officio* a member of the commission, for the announced purposes:

"First: To take such proceeding and actions as are authorized by senate bill No. 158, special session, 1933, and performing the duties imposed by said act upon the commission—to borrow from the federal government moneys in the aggregate not exceeding $200,000, and to take such action as should be necessary for such purposes, including the execution and delivery of instruments evidencing such indebtedness and creating a lien for such moneys so borrowed on the project or projects for which it is advanced—and to consider and determine the projects, work and construction and/or reservoirs, lakes, dams and embankments for which such funds shall be spent."

Plaintiff alleged that unless restrained defendants would take official action to borrow from the federal government large sums of money and execute to it instruments evidencing indebtedness for the sum so borrowed, and would use and expend the funds thus obtained for the numerous purposes set out in the act.

Plaintiff also alleged that unless restrained the state auditor and state treasurer would set aside as a special fund 10 per cent of the moneys derived from the collection of license fees for the privilege

of hunting, fishing and trapping, and would pay out the moneys thus set aside in liquidation of the principal and interest of the indebtedness thus incurred by the commission.

Plaintiff alleged that the commission is not a legal entity and has no corporate status, and that any power it can lawfully exercise is that of an official agency of the state, and that any loans or contracts it might negotiate and consummate, if valid and effective, would be obligations of the plaintiff and burdens upon it.

Plaintiff alleged that inherent in the statute were certain specified infirmities which may be summarized thus:

(a) The act makes the state a party in carrying on works of internal improvement other than highways in violation of article 11, section 9, of the state constitution.

(b) The act does not conform to the constitutional requirement governing the contraction of a state debt to defray extraordinary expenses and making public improvements as prescribed in article 11, sections 6 and 7 of the state constitution.

(c) Section 5 of the act expressly attempts to amend, supersede, or "suspend" the operation of provisions of existing statutes in disregard of article 2, section 16 of the constitution.

(d) The act authorizes the withdrawing of money from the state treasury without a specific appropriation made by law, in breach of article 2, section 24 of the constitution.

Plaintiff's petition descends into further details touching the alleged invalidity of the act, but these need not be mentioned here.

The state auditor and state treasurer answered briefly, raising no material issue of fact, but only issues of law.

The members of the commission answered at length, asserting the validity of the act and the powers they intended to exercise under its terms, and—

"III. Further answering, these defendants allege that in the passage of senate bill No. 158 (ch. 107, S. S. L. 1933) referred to in said second amended petition and house bill No. 3 hereinabove referred to, the purpose and intent of the legislature of the state of Kansas was to provide machinery for coordinating federal and state efforts to accomplish measures for general relief of the citizens of the United States and particularly of the state of Kansas, during the period of economic emergency which has existed for several years, and still exists throughout the United States, and for the purpose of conserving natural resources and providing labor for the unemployed. Defendants aver that the economic emergency referred to has been so extended, pronounced and acute as to be recognized and declared by the national congress in what is known as the national industrial recovery act, of June 16, 1933, and other acts of the same congress. That same was recognized in the following language of the national industrial recovery act, to wit:

## "DECLARATION OF POLICY

" 'SECTION 1. A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of congress—to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources.'

"That in order to accomplish the declared purposes and to ameliorate conditions prevailing throughout the United States, the legislative and executive branches of the federal government have permitted and sanctioned wide latitude and liberal constructions concerning the prohibitions or inhibitions of the federal constitution and laws and regulatory acts during the acute stage of economic distress, which still prevails throughout the land; and in the national industrial recovery act *have encouraged the several states and political subdivisions thereof to coöperate with the federal government regardless of constitutional or legal restrictions,* and to utilize federal moneys for the declared purposes as is set forth in subdivision D of section 203 of subtitle 2 of said act, entitled 'Public Works and Construction Projects' in the following language, to wit:

" 'd. The President, in his discretion and under such terms as he may prescribe, may extend any of the benefits of this title to any state, county or municipality, notwithstanding any constitutional or legal restriction or limitation on the right or power of such state, county or municipality to borrow money or incur indebtedness.' "

Defendants join issue with plaintiff on the alleged constitutional infirmities of the act, and—

"Deny that the act provides for the contraction of a public debt 'without providing for the levying of an annual tax sufficient to pay the annual interest of such debt, and the principal thereof, when the same shall become due.' And defendants allege that the funds with which the said indebtedness will be liquidated are derived from levy of license taxes upon the taking of fish and the trapping of fur-bearing animals from the waters of Kansas, the hunting of wild game, water fowl and upland birds, as well as from other revenue annually paid in to the treasury of the state of Kansas, for the forestry, fish and game commission of said state; ten per cent of which total sum has heretofore been deposited in the general fund of said state, while ninety per cent thereof has been and still is held and kept in a special fund for said commission. That the annual receipts of the treasury of the state of Kansas, since the creation of the first forestry, fish and game commission of said state, on or about the year 1925, have been as set forth on the subjoined exhibit A hereto attached and made a part hereof. That the said levy of license tax hereinabove referred to has not been and is not made for the purpose of regulation, but solely and only for the purpose of revenue. That the smallest annual aggregate return to the state treasury from said sources since the establishment of the forestry, fish and game commission was the sum of $108,-

009.60; and that the largest aggregate annual return during said term was $351,060.70. That the average annual aggregate return during said period was $201,085.80. That ten per cent of the said annual return would be more than sufficient to pay the annual interest and amortize the principal over any reasonable period of time, and thus be a self-liquidating project."

EXHIBIT A

GENERAL REVENUE RECEIPTS FROM FORESTRY, FISH AND GAME COMMISSION

| Fiscal year | Receipts | Fiscal year | Receipts |
|---|---|---|---|
| 1925 | $12,647.78 | 1930 | $19,702.09 |
| 1926 | 10,800.96 | 1931 | 35,106.07 |
| 1927 | 14,436.51 | 1932 | 20,487.45 |
| 1928 | 18,502.89 | 1933 | 15,359.40 |
| 1929 | 33,934.07 | | |

By stipulation of parties, certain rules of the federal government touching its attitude and policy in making loans to public bodies were introduced. These, in part, read:

"SEC. 9. *Price of bonds and interest rate of public bodies.* The United States will bid par and accrued interest, for bonds to finance projects of public bodies, approved by the administrator, provided all bonds bear interest at the rate of 4 per cent or more. In the event such bonds bear interest at the rate of more than 5 per cent the difference between 4 per cent and the coupon rate will be refunded by the United States from time to time during the period while such bonds remain in the possession of the United States.

"SEC. 10. *Amortization.* Bonds and obligations under contract of lease are to be annually amortized pursuant to state statutes and according to the life of the project not to exceed thirty years except in the case of such projects as obviously have a longer life and in no case to exceed fifty years."

In the pleadings of both plaintiff and defendants there was an allegation and admission that—

"The debt authorized to be incurred by said chapter 107 will not, together with any other existing state debt or debts incurred for the purpose of defraying extraordinary expenses and the making of public improvements, exceed in the aggregate the sum of one million dollars, . . ."

The trial court reached a conclusion of law as follows:

"That the improvements authorized and provided for by said chapter 107 of the 1933 Special Session Laws of Kansas are public improvements within the meaning of article 11, section 5 [6] of the Kansas constitution, and that the provisions of said act are not in conflict with the provisions of said section 5 [6] or any of the other provisions of the constitution of the state of Kansas, and that said act is valid and effective; that the appropriation of the 10 per cent of the income of the forestry, fish and game commission of Kansas for the payment of all amounts of principal borrowed under the provisions of said act, and the interest thereon, shall not be repealed nor postponed or diminished until the interest and principal of such debt have been wholly paid;

that the temporary injunction heretofore granted herein should be vacated and set aside and that plaintiff should be denied an injunction."

Judgment for defendants was entered accordingly. The state appeals, assigning errors which center about the pertinent questions of constitutional law arising on the face of the statute.

The controlling features of our state's fiscal policy are dictated by certain provisions of the state constitution, which, so far as here pertinent, read:

### ARTICLE 11

"SEC. 4. The legislature shall provide, at each regular session, for raising sufficient revenue to defray the current expenses of the state for two years.

"SEC. 5. No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same; to which object only such tax shall be applied.

"SEC. 6. For the purpose of defraying extraordinary expenses and making public improvements, the state may contract public debts; but such debts shall never, in the aggregate, exceed one million dollars, except as hereinafter provided. Every such debt shall be authorized by law for some purpose specified therein, and the vote of a majority of all the members elected to each house, to be taken by the yeas and nays, shall be necessary to the passage of such law; and every such law shall provide for levying an annual tax sufficient to pay the annual interest of such debt, and the principal thereof, when it shall become due and shall specifically appropriate the proceeds of such taxes to the payment of such principal and interest; and such appropriation shall not be repealed nor the taxes postponed or diminished, until the interest and principal of such debt shall have been wholly paid.

"SEC. 7. No debt shall be contracted by the state except as herein provided, unless the proposed law for creating such debt shall first be submitted to a direct vote of the electors of the state at some general election; and if such proposed law shall be ratified by a majority of all the votes cast at such general election, then it shall be the duty of the legislature next after such election to enact such law and create such debt, subject to all the provisions and restrictions provided in the preceding section of this article. .

. . . . . . . . . . . . . . .

"SEC. 9. The state shall never be a party in carrying on any work of internal improvement except that it may adopt, construct, reconstruct and maintain a state system of highways, but no general property tax shall ever be laid nor bonds issued by the state for such highways."

(The above sections are renumbered as they appear in R. S. 1933 Supp., pp. xx, xxi, by authority of Laws 1931, ch. 300, § 2; and such numbering is used throughout this opinion except in direct quotations.)

"Art. 2, § 24. No money shall be drawn from the treasury, except in pursuance of a specific appropriation made by law, and no appropriation shall be for a longer term than two years."

"Art. 2, § 16. . . . No law shall be revived or amended, unless the new act contain the entire act revived or the section or sections amended, and the section or sections so amended shall be repealed." (Constitution of Kansas, R. S. 1923.)

These provisions make it clear that from the foundation of the state the mandate of the constitution has prescribed a fiscal policy of "pay as you go" so far as current expenses of state government are concerned. And indeed, this policy has been faithfully followed. In bygone years, when money was appropriated, and warrants lawfully issued therefor, but where the requisite cash was not in the treasury, such warrants, formerly called *scrip*, were stamped "Not paid for want of funds." Such a situation could yet arise, and is provided for. (R. S. 75-606; R. S. 10-813.) In the case of *State, ex rel., v. School Fund*, 4 Kan. 261, the constitutionality of an act authorizing an issue of bonds to pay the *per diem* and mileage of the members of the legislature was assailed by the attorney-general. In his argument, which appears in the official report at page 264, he said:

"If the treasury of the state fails to supply funds to meet the salaries and expenses for which appropriations are made, scrip issues in lieu thereof, and the fact that there is a deficit of money to meet such regular and ordinary expenses, does not render the expenses extraordinary in their nature."

The court held the act invalid. Two sections of the syllabus read:

"4. Payment of the current and legislative expenses are not 'extraordinary expenses' within the meaning of section 5, article 11 of the constitution.

"5. The issuance of the bonds of the state for current and legislative expenses, and the drawing of moneys from the school fund thereon, is the creation of a debt, within the meaning of sections 5 and 6, article 11 of the constitution. An unpaid warrant is not a debt within the meaning of the said constitutional provisions."

In the course of the court's opinion Chief Justice Kingman, who had been a member of the constitutional convention, said:

"If the taxes levied are inadequate to meet the current expenses, those having claims against the state will find in depreciated scrip just cause and adequate motive to make their grievances known, and the people can correct the evil by instructing their agents to make the taxes higher or the expenses less, as they may deem right. The section is quoted and commented on, as necessary to show the settled policy of the state. Its object was to prevent extravagance by calling immediate and general attention to it in the shape of high taxes, or in depreciated credit, thus indirectly, but very efficiently, prescribing limitation upon that subject. . . . The object is plainly stated in the title to be for the purpose of paying the officers and members of the legislature and current expenses of the state. These are the common and ordinary

charges of a government, accruing necessarily each year. None more so can be imagined. They are precisely what the constitution declares shall be met by annual taxation. . . . We are not disposed to deny that an unpaid warrant of the state is a debt, in one sense of that term; but it could never be expected that any financial scheme extending over a state could be so arranged as that the revenue each year should exactly balance the audited claims. Such a construction would demand an impossibility; but the general financial policy of the state is to make them balance as near as may be, and this does not contract a debt in the meaning of the constitution." (pp. 268-271.)

Touching extraordinary expenses and public improvements, the constitution says that state debts may be incurred to meet them, but such debts shall never in the aggregate exceed one million dollars without popular ratification at a general election. The constitution descends into particulars as to the matters any such act must contain. It must specify the purposes for which the debt is to be contracted. *It must provide for levying an annual tax sufficient to pay the annual interest and the principal debt as it shall become due.* It should not be left to mere guess work. It must also specifically appropriate the taxes so levied and collected to the payment of the principal and interest; and such appropriation must not be repealed nor the taxes postponed or diminished until the debt and interest are paid in full. (There is another provision of the constitution which authorizes the state to borrow money [art. 11, § 8] to repel invasion, suppress insurrection or defend the state in time of war, but that feature is not involved in this lawsuit.)

The avowed purpose of this challenged act is to authorize the borrowing of money from the national government. The text of the act authorizes the commission to borrow any amount not exceeding $200,000, and the funds thus procured shall be used to develop natural resources, to control and utilize water, to prevent soil erosion, to control floods, and to meet all preliminary requirements of the federal government in connection with the foregoing projects. The act also confers on the commission authority to use these borrowed funds to build and construct reservoirs, lakes, dams and embankments for impounding water; and to use such borrowed funds on public forestry, recreational grounds, and fish and game preserves, and in the improvement of such recreational grounds and fish and game preserves.

The attorney-general contends that these manifold projects are essentially internal improvements and thus come under the ban of section 9 of article 11 of the constitution.

There is a certain sense in which internal improvements might be regarded as public improvements; but since our constitution absolutely forbids the state to be a party to the one, while permitting it to indulge in the other, we must look to the meaning of these terms as they were understood in 1859 when the founders of this state wrote our constitution.

Any student of American history should know that for the first half of the nineteenth century no political question—not even the tariff or human slavery—was so persistently an issue in state and national affairs. President Jefferson advocated internal improvements as a national policy, but was doubtful whether the federal constitution would permit it. John Quincy Adams held to the liberal view of the constitution and advocated internal improvements. President Andrew Jackson vetoed various measures of that character. Meantime the states, beginning with the Erie Canal—"Governor Clinton's Big Ditch"—embarked on works of internal improvements on a vast scale. Such national and state projects speedily developed two vices—log-rolling to obtain these improvements for favored localities at the expense of the rest of the state or nation, and a scandalous waste of public funds and the creation of an unprecedented amount of public indebtedness which culminated in the total destruction of state credit.

In volume 3 of Schouler's History of the United States, pp. 480, 481, it is said:

"Upon the question of internal improvements, Jackson saw from the drift of legislation at the first session of this congress that his party friends were not disposed to act in concert or regard his wishes. He applied, therefore, his own corrective,"—[a vigorous exercise of his veto power.] . . .

"Jackson thus set the seal upon log-rolling legislation more firmly and with better logical consistency than Monroe had done, for his constitutional objection extended to the public subscription to works of such character, as well as to originating and constructing them. He would not spend the public money in building canals and roads on the public responsibility, nor would he invest it in pet local enterprises of which private speculators had the control. The general ground of objection, as he stated it, was that internal improvements at the national cost should wait until the national debt was paid, and the constitution amended besides, so as to sanction the right. But Jackson's objection lay deeper. Special legislation and jobbery of all kinds he detested. The abuses to which such appropriations led far exceeded, as he clearly saw, the good they were capable of promoting. While the distinction attempted between works of a local and national character was always a vague and shadowy one at best, politicians and speculators had of late become more and more involved in one another's schemes, and there was constant danger

that by the artful expedients of capitalists the losses of their own unsuccessful enterprises would be shifted upon the government. Even in the matter of surveys it had come to such a pass that a state, a town, or a private company, with a road or canal to construct, pushed to have the work laid out at the cost of the United States, and thus save an inferior item of expense. Gratitude for national assistance was not properly bestowed. It was shown, not to the Union which assumed the local burden, but to the man whose influence carried the needful measure through congress, and who usually expected political favors in return. The growing evils attending this barter of influence, which surely fostered corruption, Jackson courageously used the vast power of his office to suppress."

See, also, 3 Schouler, 54-57, 247-248, 295, 296; 4 id. 155, 184; 5 id. 293.

In volume 23, Historians' History of the World, p. 365, in discussing state conditions in 1845, brought about by improvident schemes of *internal improvements,* it is said:

"While the national finances were slowly recovering themselves, the state finances, with some exceptions, appeared to be on the brink of ruin. The states had run a race of extravagance and hazard unparalleled in American history. In the two years preceding the commercial crisis the issue of state stocks—that is, the amount of money borrowed by the states—was nearly $100,000,000. The inevitable consequences followed. While such as had anything to support their credit were deeply bowed, those that had nothing—those that had borrowed not so much to develop their resources as to supply the want of resources—fell, collapsed and shattered. Some states—Maryland (January, 1842) and Pennsylvania (August, 1842)—paid the interest on their debts only by certificates, and by those only partially. Others—Indiana (July, 1841), Arkansas (July, 1841) and Illinois (January, 1842)—made no payments at all. Two—Michigan (January, 1842) and Louisiana (December, 1842)—ceased not merely to pay, but in part to acknowledge their dues, alleging that the frauds or failures of their agents, from which they had unquestionably suffered, released them from at least a portion of their obligations.

"But in this, as in every other respect, in extent as well as in priority of insolvency, Mississippi took the lead. . . . At all events, Mississippi deliberately repudiated her debts (1842). Her example was imitated at the same time by the neighboring territory of Florida.

"Eight states and a territory were thus sunk into bankruptcy, some of them into what was worse than bankruptcy. It was not, of course, without dishonour or without injury to the Union of which they were members. When a national loan was attempted to be effected abroad, not a bidder could be found for it, or for any part of it, in all Europe (1842)."

It was during the reaction which followed those distressful experiences that our state constitution was written. That the members of the constitutional convention were determined to shield our state from a like experience is perfectly clear from the tenor of the debates. (See Wyandotte Const. Con. 229, 230, 233.)

Chief Justice Valentine, in *Leavenworth County v. Miller*, 7 Kan. 479, 493, had occasion to discuss this subject:

"The state, as a state, is absolutely prohibited from engaging in any works of internal improvement. We will concede that this prohibition does not extend to the building of a statehouse, penitentiary, state university, and such other public improvements as are used exclusively by and for the state, as a sovereign corporation; but it does extend to every other species of public improvement. It certainly extends to the construction of every species of public improvement which is used, or may be used, by the public generally— by any and every private individual who may choose to use it—such as public roads, bridges, etc. *Wetumpka v. Winter*, 29 Ala. 660. Now, notwithstanding this prohibition upon the state, notwithstanding that it is prohibited from opening up or constructing any roads, highways, bridges, ferries, streets, sidewalks, pavements, wharfs, levees, drains, waterworks, gas works, or the like, yet we find it authorizing public corporations to do so. And although it is prohibited from exercising the sovereign power of eminent domain in its own favor in opening up and constructing roads, highways, bridges, ferries, etc., yet we nevertheless find it exercising said sovereign power in favor of public corporations."

In the recent case of *State, ex rel., v. State Highway Comm.*, 138 Kan. 913, 921, 28 P. 2d 770, Mr. Justice Harvey takes cognizance of the recent amendments to the constitution touching *internal improvements*, and directs attention to the proceedings of the Wyandotte Constitutional Convention:

"Some of the members of the (constitutional) convention were familiar with the early history of Indiana and other states which loaded themselves down with obligations for the construction of internal improvements. This they sought to avoid; so it was provided that the state should never be a party to any works of internal improvements. By 1919 our people had reached the conclusion the state might be permitted to carry on works of internal improvements in so far as they pertained to highways . . ." (p. 919.)

The provision which forbids the state to be a party to carrying on works of internal improvement was modeled on the constitution of Wisconsin. (Perdue, Sources of Constitution, Vol. 7, Kan. Hist. Coll. 130-151; Reprint of Wyandotte Const. Con. 676, 690-691.) In *State, ex rel. Jones, v. Froehlich*, 115 Wis. 32, 91 N. W. 115, 117, the validity of an appropriation to strengthen a levee system was called in question as an internal improvement and therefore unconstitutional. It was so held, and in the opinion the leading cases on the subject down to that time were referred to thus:

"In other cases the expression 'works of internal improvement' contained in constitutional prohibitions similar to ours, has been declared to include enterprises as follows: Dredging sand flats from a river (*Ryerson v. Utley*, 16 Mich. 269) deepening and straightening river (*Anderson v. Hill*, 54 Mich. 477,

20 N. W. 549); constructing or operating street railways (*Attorney-general v. Pingree*, 120 Mich. 550, 79 N. W. 814, 46 L. R. A. 407); telephone or telegraph lines (*Northwestern Tel. Exch. Co. v. Chicago, M. & St. P. R. Co.*, 76 Minn. 334, 345, 79 N. W. 315); irrigation reservoirs (*In re Senate Resolution Relating to Appropriation of Moneys Belonging to Internal Impr. Fund*, 12 Colo. 287, 21 Pac. 484); roads, highways, bridges, ferries, streets, sidewalks, pavements, wharves, levees, drains, waterworks, gas works (*obiter*, *Leavenworth Co. v. Miller*, 7 Kan. 479, 493, 12 Am. Rep. 425); levees (*Alcorn v. Hamer*, 38 Miss. 652); improvement of Fox river (*Sloan v. State*, 51 Wis. 623, 632, 8 N. W. 393); levees and drains (*State v. Hastings*, 11 Wis. 448, 453)." (p. 40.)

To the legal literature on this general subject our own court made a notable contribution in *State v. Kelly*, 71 Kan. 811, 81 Pac. 450, where the act of 1905 establishing a state oil refinery at Peru, under the guise of a branch penitentiary, was held to violate the constitutional prohibition against the state embarking on works of internal improvement.

The foregoing is very far from an exhaustive examination of the historical origin and object of this provision of our fundamental law which forbids the state to engage in works of internal improvement, but it should serve to test the constitutionality of the manifold purposes and indefinite projects authorized by the act under consideration. Some of the purposes of the act are doubtless intended to mean works pertaining to the improvement and beautification of the state's own property—its fish and game preserves. These may fairly be regarded as *public improvements* which the constitution does not forbid. But can the same be said for all the other broad and indefinite purposes hinted at in section 4 of the act? It is suggested that this court should assume that the commission would not undertake any of the works suggested in section 4 except those which are incidental to the improvement of state fish and game preserves. That does not follow. Indeed, the called meeting of the commission for December 4, 1933, set out above, gave potent warning that action was to be taken on a broad program of improvements which should be guided largely by the suggestion or dictation of the federal authorities. Indeed, the answer of the commission filed in this case virtually admits that the act did not direct them to do anything in particular; and it is fairly clear that defendants were prepared "to coöperate" in any project the federal authorities would sanction "regardless of constitutional or legal restrictions." It is sometimes ironically said: "What's the constitution between friends?" but mayhap that idea has not hereto-

fore been put forward to justify an act of the legislature when its constitutionality has been called in question in the solemnity of a judicial proceeding. The present severe and long-protracted economic depression calls for large drafts of legislative power for the relief of the poor, and this desideratum our constitution generously sanctions and encourages; but economic distress is no justification for ignoring the constitution itself. As was so well said recently by the chief justice of the United States in passing on the constitutionality of the Minnesota moratorium act:

"Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. . . .

"The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions. . . . Even the war power does not remove constitutional limitations safeguarding essential liberties. When the provisions of the constitution, in grant or restriction, are specific, so particularized as not to admit of construction, no question is presented . . ." (*Home Building and Loan Ass'n v. Blaisdell,* 78 L. Ed. 255.)

Heretofore in statutes authorizing the construction of some public improvement the practice has been for the legislature to specify with particularity just what improvement was authorized and at what maximum cost—as the erection of a ward at a state hospital, an engineering building at the state university, an annex to the state reformatory, a hospital at the girls' industrial school, yes, even a state oil refinery at Peru. In such cases it would be a comparatively simple question for the court to decide whether the work authorized by the legislature was within the constitutional mandate governing such expenditures. But so much cannot be said for the present statute. We do not know, and neither did the legislature itself know or declare what specific projects it was authorizing the commission to undertake, and for what specific purposes it was authorizing the creation of a state debt.

The defendants, however, insist that what the statute means is that the works and projects to be undertaken, indefinite though they be, and whatever they may turn out to be, are not internal improvments but public improvements, and are justified, in part at least, by the existing economic emergency.

In that view the judicial question before us is a much simpler one. To defray extraordinary expenses and to make public improvements, the state may contract public debts. But the constitution

specifically outlines how that can be done. To accomplish this the act must *specify* the *purpose* for which the debt is to be created. It must levy a tax sufficient to pay the annual interest and the principal of the debt as it becomes due. The act under scrutiny does not conform to these requirements. The act must make an appropriation of the taxes thus provided for to the payment of principal and interest. In this respect also the act is defective. The fair intendment of the constitutional provision also, we think, is that the act in specific terms should make the declaration that the appropriation shall not be repealed nor the taxes postponed nor diminished until the debt is paid in full. Of course lawyers know that this latter provision is impliedly incorporated in the contract of indebtedness under the rule of *lex loci contractu,* and it is not absolutely essential to the validity of the contract of indebtedness that such declaration should appear therein *in haec verba;* but the constitution contemplates that acts creating such indebtedness may require a popular referendum to give them effect, and it is only fair and just that the electors, who are not lawyers, should be clearly apprised of what they are asked to sanction. The court notes that this recital did not appear in the soldiers' compensation acts, Laws 1921, ch. 255, and Laws 1923, ch. 200; nor in Laws Special Session 1933, ch. 98, but see the enactment supplemental to the latter, in House bill No. 11, published in the official state paper March 6, 1934, which supplies this formal omission in the highway act of 1933.

There is, however, one infirmity in this statute not manifest on its face, which even the wayfaring man should understand when his attention is directed to it. For some reason which the court cannot discern, the litigants have seen fit to plead and admit that it is not in the case, but its gravity is so potent that the court must take judicial notice of it. It cannot be ignored. Under the section of the constitution which authorizes the state to incur an indebtedness to defray extraordinary expenses and make public improvements, it is provided that such indebtedness shall never in the aggregate exceed $1,000,000 without an affirmative vote of the people. The state debt already incurred under this provision of the constitution is greatly in excess of that sum on account of the extraordinary expenses incident to paying the soldiers' compensation authorized by the statutes of 1921 and 1923 cited above. Such state debt at this writing is $21,250,000, according to the records of the state auditor as of March 1, 1934.

Mayhap the litigants consider that this million-dollar limitation is not involved because the present act only sanctions the creation of a debt not exceeding $200,000, and because it is to be a debt for public improvements, while the existing soldiers' compensation debt was incurred as an extraordinary expense, and that a distinction between that debt and the proposed one for public improvements is practicable and logical. It may also be argued that the soldiers' compensation indebtedness was upheld, in part at least, under article 11, section 8, to pay .for defending the state in time of war; but a careful perusal of this court's decision will show that the validity of the bond issue was predicated on its conformity with sections 6 and 7 of article 11 (then numbered sections 5 and 6), as an extraordinary expense. (*State, ex rel., v. Davis,* 113 Kan. 4, 213 Pac. 171.) All that section 8 had to do with it was to justify the proposed debt as an extraordinary expense. Now, it should be observed that "extraordinary expenses" and "public improvements" for which a state debt may be created are authorized by the same constitutional section, and are to be incurred in the same way, and under the same strict limitations. It is "in the aggregate"—not in the disjunctive or computed separately—that such an indebtedness must not exceed a million dollars without a vote of the people. The consequence, obvious and inescapable, is that since the state debt authorized by section 6 is already in excess of a million dollars, no further indebtedness can be created under that section for extraordinary expenses and public improvements without an affirmative vote of the people.

This conclusion renders it unnecessary to rule absolutely on the question whether the purposes of the statute and the projects it purports to authorize are merely internal improvements (other than to create and maintain a system of highways) which the state is forbidden to undertake. This conclusion likewise disposes of other debatable questions raised in the attorney-general's brief, including the very difficult one arising from section 5 of the act which would amend or "suspend" certain expressly named sections of the general statutes without rewriting them to conform to the latest legislative purpose. On that point, see *Atchison, T. & S. F. Rly. Co. v. Board of Education,* 123 Kan. 378, 382, 255 Pac. 60, and citations; *School District v. Hahn,* 126 Kan. 117, 119, 267 Pac. 28.

The judgment of the district court is reversed, and the cause remanded with instructions to enter judgment for plaintiff.