Honorable Lance Kinzer State Representative, 14th District 12549 S. Brougham Olathe, Kansas 66062
Dear Representative Kinzer:
As state representative for the 14th district, you raise several issues regarding the relationship between the Kansas Department of Commerce, the National Association of State Workforce Agencies (NASWA), and America's Job Link Alliance-Technical Support (AJLA-TS). To better understand that relationship, a review of two of the federal workforce laws is helpful.
To receive certain federal workforce development funds, states must comply with federal laws in the area of employment and labor markets — such as the Workforce Investment Act of 1998 (WIA), 29 U.S.C.A. § 2811et seq., and the Wagner-Peyser Act (WPA), 29 U.S.C.A. § 49 etseq.[1] Under the WIA and WPA, the states must develop and maintain a "statewide workforce investment system"[2] and a "statewide employment statistics system."[3] The information in the statewide employment statistics system includes data on employment and unemployment conditions; industrial distribution of occupations, such as current and projected employment opportunities, wages, benefits, and skill trends by occupation and industry; workers displaced by layoffs and closings; and earnings information.[4]
NASWA is a private, non-profit corporation. Its members are the administrators of the state agencies who are responsible for the state's unemployment insurance, training programs, employment statistics, labor market information, and other programs and services provided by a publicly-funded state workforce investment system. NASWA advocates for legislation and policies supporting state workforce agencies and programs, collaborates with federal workforce agencies, provides information on workforce development, and coordinates local, state, and federal roles.
AJLA-TS is a part of the Kansas Department of Commerce. Pursuant to K.S.A. 2008 Supp. 74-5002y, [5] the Department of Commerce has contracted with NASWA to provide the services of AJLA-TS to NASWA members.[6] Under the contract, AJLA-TS develops and maintains computer software for the state agencies responsible for their state's workforce investment system and trains those agencies' employees on the software.[7] The software, in short, gathers, compiles, and disseminates the data required by state and federal workforce laws, such as WIA and WPA, to analyze economic development trends, develop budgets for the federal grants, and implement a one-stop career center for job-seekers and employers.
Your question whether the contractual relationship between the Department of Commerce and NASWA violates the provision in Article 11, § 9, of the Kansas Constitution prohibiting the State from being "a party in carrying on any work of internal improvement." Because Kansas appellate courts have not considered the term "work of internal improvement" in this context, we review the history of this provision which was recounted before a legislative committee.[8]
 The constitutional language was molded . . . by national fervor over state debt defaults and debt repudiations resulting from excessive debt financing of internal improvements by state governments in the 1820-1840 period. The roots of this debt fiasco are tangled but may be found in the financial vacuum left by Andrew Jackson's curtailment of federal aid for internal improvements and his derailment of the U.S. Bank which was a stable source of financing such improvements. Encouraged by early successes in state financing of internal improvements, such as New York's underwriting of the Erie Canal, state governments moved into this vacuum often with grandiose plans for roads, canals, and financing, [resulting in] monumental debts in a few short years. . . . Nine states defaulted on their debts; four repudiated all or part of their debts; and others secured downward adjustments in debt payments. . . . From this point in time . . . limitations on state debt or on state participation in internal improvements or both were written into every state constitution.[9]
Since its adoption in 1859, the provision has been amended to allow exceptions for highways, flood control, certain economic development, internal works authorized by separate bills passed by two-thirds of each house of the legislature, and expenditure of federal funds.[10]
The Kansas Supreme Court has distinguished between "public improvements" which are authorized in Article 11, § 6, of the Kansas Constitution[11] and "internal improvements" which are prohibited in Article 11, § 9, of the Kansas Constitution. "Public improvements" are public buildings used exclusively by and for the state to carry out its functions, such as the statehouse, penitentiaries, and state educational institutions. "Internal improvements" are canals, roads, highways, bridges, ferries, streets, sidewalks, pavements, wharfs, levees, drains, water-works, gas-works and like structures that are used by the general public.[12]
However, because of some language in two early Kansas Supreme Court decisions, the constitutional prohibition is often cited for the proposition that the State cannot compete with private business in commercial-type enterprises.[13]
In State v. Kelly, [14] the Court considered the propriety of a statute authorizing an appropriation for the construction and operation of a state oil refinery on the premises of a state penitentiary. The stated purpose of the statute was that the refinery would provide employment for the inmates. In reviewing the legislative history of the statute, it was clear to the Court that the true object of the legislation was to keep Kansas petroleum from "rapidly falling into the hands of the most arrogant and despotic trust in the world [Standard
Oil Company]."[15] Thus, the Court had no difficulty in concluding that the statute appropriating public funds for the construction, operation, and maintenance of a state oil refinery was a "work of internal improvement" and void.[16]
However, in dicta, the last paragraph of the opinion states:
 [T]his is the first time that it has become necessary to invoke the aid of this provision of the constitution to protect the state in its sovereign capacity from the public disaster that history shows would follow its engaging in a purely private business enterprise. It has been the policy of our government to exalt the individual rather than the state, and this has contributed more largely to our rapid national development than any other single cause. Our constitution was framed, and our laws engaged, with the idea of protecting, encouraging and developing individual enterprise, and if we now intend to reverse this policy, and to enter the state as a competitor against the individual in all lines of trade and commerce, we must amend our constitution and adopt an entirely different system of government.[17]
In State, ex rel., v. Kaw Valley Drainage District, [18] the Court considered whether a drainage district was authorized by statute to construct and operate a sand plant, for profit, and use the proceeds to carry out its statutory mandate of providing a drainage system for the district. To support its argument that the statute authorized such activity, the district contended that allowing drainage districts to engage in selling sand would serve the public's interest because, at that time, the price of sand was "unreasonable and excessive" due to control by a few private business interests. The Court concluded that the construction and operation of a sand plant was for "a purely commercial enterprise" and that the "internal improvements" provision prohibited both the state and its subdivisions from engaging "in purely commercial enterprises."[19] Accordingly, while the drainage district could sell sand, it could not construct and operate a plant to prepare the sand for sale. Both Kelly and Kaw Valley Drainage District involved construction of structures.
Except for a 1998 opinion, past Attorney General opinions have not addressed the issue of whether a "work of internal improvement" — given the above history and case law — is limited to the construction of a structure. In Attorney General Opinion No. 98-22, Attorney General Carla J. Stovall concluded that a statute authorizing the Kansas Development Finance Authority to issue transition bonds to recover certain utility costs did not violate the prohibition because "internal improvements" are limited to "tangible projects and structures constructed for use by the general public."
The Kansas appellate courts have not had occasion to interpret the phrase in a context not involving construction of a structure. However, since the Kansas constitutional prohibition against internal improvements was modeled on the Wisconsin constitutional prohibition, [20] it is helpful to understand how the Wisconsin appellate courts have interpreted the term.
The Wisconsin Constitution prohibits the state from contracting debts for works of internal improvement or being a party in carrying on such works. In a 1902 opinion, the Wisconsin Supreme Court acknowledged the breadth of this prohibition: "The words themselves are capable of including substantially every act within the scope of governmental activity which changes or modifies physical conditions within the limits of the commonwealth."[21]
In Wisconsin Development Authority v. Dammann, [22] it was argued that the appropriation of state funds to reimburse the Wisconsin Development Authority, a private non-profit corporation, for its expenditures to effect the purposes specified by statute violated the constitutional prohibition against internal improvements. In finding no violation, the Court explained:
 Performance by the Wisconsin Development Authority of the prescribed duties and functions by merely promoting or encouraging the organization or creation of municipal power districts, cooperative associations or nonprofit corporations, and the mere making of the surveys and studies, engaging in the research, planning and educational activities, and acting in cooperation with the federal government and its agencies when necessary in the execution of the prescribed duties and functions, would not in and of itself create any such physical structures or conditions as would constitute "works of internal improvement" within the meaning of that term as used [in the Constitution of Wisconsin].[23]
In State, ex rel. Warren v. Reuter, [24] the Wisconsin Supreme Court reviewed a statute appropriating public monies to a private non-profit school of medicine. It stated:
 We need not now decide whether the construction of a building for Marquette School of Medicine is a work of internal improvement, because all that is involved here is an appropriation for operating expenses. The state funds are appropriated for medical education, teaching, and research; and promotion, research and educational activities we have held are not internal improvements.[25]
Alabama and Virginia also have constitutional prohibitions against the state engaging in or being a party to works of internal improvement. Citing Wisconsin Development Authority v. Dammann, the Alabama Supreme Court found that the phrase "works of internal improvement" encompasses all "improvements of a more or less fixed and permanent character."[26] The Court then concluded that the operation of state liquor stores was not a "work of internal improvement."[27]
In Virginia, a statute provided that inmates be put to work grinding shells and rocks and that the proceeds from the sale of the product be used for the support and keep of the inmates. The legislature appropriated state funds for the material and the instrumentalities required to do the work including the construction of the temporary structures for housing the inmates. The Court concluded that "[t]he cheap structures used for grinding limestone rock and oyster shells have no element of permanency about them and may be moved from place to place as the necessity arises. The term `internal improvements,' as used in the Constitution, was never intended to include such work."[28]
We also note that the federal acts for the admission of Kansas and Colorado into the union and the Kansas and Colorado Constitutions have similar provisions requiring the states to use certain federal monies for making "internal improvements."[29] Thus, our analysis is aided by an 1893 Colorado Supreme Court case determining what constituted internal improvements. In its analysis, the court considered "the sense in which those words are used in American legislation." It concluded that "internal improvements" meant improvements located within the state that were "of a fixed and permanent nature, as improvements of real property" and that were "designed and intended for the benefit of the public."[30] Thus, any appropriation from this fund had to "be confined to permanent improvements of real property within the state, and for the benefit of the public."[31]
Based upon the origins of the constitutional prohibition and interpretations by the Kansas appellate courts and courts in other jurisdictions, we discern a two-prong test to determine whether a project is a "work of internal improvement" under Article 11, § 9, of the Kansas Constitution. The first prong is whether the project involves construction of a permanent fixed structure or a permanent alteration of real property. If answered in the affirmative, the second prong is whether the structure or alteration is for the benefit of the general public. If both prongs are met, the project is a work of internal improvement. If the state is a "party" to such work, the Kansas Constitution prohibits such activity.
The contract between the Department of Commerce and NASWA requires the Department to provide computer software that collects, stores, and disseminates workforce and labor data and to train the employees of state workforce development agencies that use the software. Accordingly, the contract does not meet the first-prong of the above test and there is no need to analyze the second prong. Therefore, this contract does not violate the internal improvements clause.
Your next question, in essence, is whether the contract between the Department of Commerce and NASWA comports with the public purpose doctrine. The public purpose doctrine allows the legislature to "appropriate public money for private individuals so long as the appropriation promotes the public welfare."[32]
It is unclear whether the Department of Commerce's relationship with NASWA and AJLA-TS involves state funding being funneled to private individuals. The Department has advised this office that the AJLA-TS is funded solely through federal funds and subscription fees from other states' workforce development agencies.[33] The Department uses federal grant funds to compensate AJLA-TS for the latter's services.[34]
However, assuming that state funds are being used to compensate private individuals, the courts give great deference to legislative bodies in determining what is or is not a "public purpose."
 What is for the public good or what are public purposes for which appropriations may be made are questions which the legislature must in the first instance decide. In determining those questions, a state legislature is vested with a broad discretion, which cannot be controlled by the courts, except when its action is clearly evasive or violative of a constitutional provision . . . What is a public purpose for which public funds may be expended is not a matter of exact definition, and the line of demarcation is not immutable or incapable of adjustment to changing social and economic conditions that are properly of public and governmental concern.[35]
In light of this broad discretion and the fact that the legislature authorizes the Secretary of the Department of Commerce to contract for data processing services and training, [36] the public purpose doctrine is not violated.
Your last questions concern whether the activities of AJLA-TS could expose the state to liability under several legal theories. Because liability ultimately depends upon the specific facts of each case, this office does not make such determinations.
Sincerely,
 Steve Six Attorney General
 Janet L. Arndt Assistant Attorney General
SS:MF:JLA:jm
[1] 29 U.S.C.A. § 2822(a) and 29 U.S.C.A. § 49g(a).
[2] 29 U.S.C.A. § 2822(a), (b)(2).
[3] 29 U.S.C.A. § 2821(d)(8); 29 U.S.C.A. § 49g(a);29 U.S.C.A. § 49l-2.
[4] 29 U.S.C.A. § 49l-2(a)(1)(A)(i)-(iv).
[5] K.S.A. 2008 Supp. 74-5002y states: "Subject to the approval of the governor, the secretary of commerce is authorized to contract with federal government agencies, governmental entities of any state, and private not-for-profit corporations for the performance of data processing services and training."
[6] NASWA/KDOC FY 2009 Agreement for the Administration of AJLA-TS, Sections I and II.
[7] Id. at Section at II.
[8] State v. Kelly, 71 Kan. 811, 822-23 (1905) ["`Constitutions are to be construed as the people construed them in their adoption, if possible; and the public history of the times should be consulted, and should have weight in arriving at that construction.' (Citation omitted.)"]
[9] Minutes, Senate Committee on Assessment Taxation, March 18, 1986, Attachment 1 (Testimony of Dr. Edward Flentje, a faculty member at Wichita State University). See also State, ex rel. Boynton v.Atherton, 139 Kan. 197, 206 (1934).
[10] Kan. Const., Art. 11, § 9.
[11] "For the purpose of defraying extraordinary expenses and making public improvements, the state may contract public debt. . . ."
[12] State, ex rel., v. Board of Regents, 167 Kan. 587, 597 (1949);State, ex rel., v. Atherton, 139 Kan. 197, 208 (1934); State, ex rel.,v. State Highway Comm., 138 Kan. 913, 919 (1934); State, ex rel., v.Knapp, 99 Kan. 852, 854-55 (1917); Leavenworth County v. Miller,7 Kan. 479, 493 (1871).
[13] Minutes, Senate Committee on Assessment Taxation, February 26, 1986, Attachment 1; March 18, 1986, Attachment 1.
[14] 71 Kan. 811 (1905).
[15] Id. at 824.
[16] Id. at 830.
[17] Id. at 836. Emphasis added.
[18] 126 Kan. 43 (1928).
[19] Id. at 50.
[20] State, ex rel., v. Atherton, 139 Kan. at 208.
[21] State ex rel. Jones v. Froehlich, 91 N.W. 115, 116 (1902) (emphasis added).
[22] 280 N.W. 698 (Wis. 1938).
[23] Id. at 713. Emphasis added.
[24] 170 N.W. 2d 790 (Wis. 1969).
[25] Id. at 800 (citation omitted). See also 81 Wis. Op. Attorney Gen. 114 ("The internal improvements clause has historically been construed to be a limitation on state involvement in the construction of physical structures.")
[26] State, ex rel. Wilkinson v. Murphy, 186 So. 487, 490 (Ala. 1939).
[27] Id.
[28] Shenandoah Lime Co. v. Mann, 80 S.E. 753, 755 (Va. 1913).
[29] See An Act for the Admission of Kansas into the Union, Section 3,Fifth, January 29, 1861; Kansas Constitution, Resolutions; and In reInternal Improvements, 32 P. 611, 612 (Colo. 1893) (Section 12 of the Colorado Enabling Act and Section 10, Art. 9, of the Colorado Constitution required the state to use certain federal funds for the purpose of making "internal improvements" within its borders.)
[30] In re Internal Improvements, 32 P. 611, 612 (Colo. 1893).
[31] Id.
[32] Duckworth v. City of Kansas City, 243 Kan. 386, 387-88
(1988).
[33] Letter by Robert E. North, Chief Attorney, Kansas Department of Commerce, dated April 2, 2009. See 29 U.S.C.A. § 49f(a)(3)(D) — (E), d.
[34] Robert E. North letter, dated April 2, 2009.
[35] 243 Kan. at 388. Citation omitted.
[36] K.S.A. 2008 Supp. 74-5002y.